# Exhibit 2

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT AND SECURITY AGREEMENT (the "***Assignment***") is made and entered into this ⁊⃒ day of November, 2022 (the "***Effective Date***"), by and among **WAG Development, Ltd.**, a Texas limited partnership ("***Assignor***"), **KRS Fort Worth, LLC**, a Texas limited liability company ("***Assignee***") and, for purposes of acknowledgment and consent, **Remarkable Healthcare of Fort Worth, LP**, a Texas limited partnership ("***Tenant***").

WITNESSETH

WHEREAS, Assignee and Assignor have entered into that certain Purchase and Sale Agreement dated October 12, 2022, contemplating the purchase and sale of that certain skilled nursing facility located at 6649 North Riverside Drive, Fort Worth, Texas 76137 and more particularly described on Exhibit A (the "***Premises***");

WHEREAS, Assignor and Tenant entered into that certain Lease Agreement and Security Agreement dated December 13, 2010 (the "***Lease***");

WHEREAS, in connection with the purchase and sale of the Premises, Assignor desires to assign its obligations under the Lease to Assignee and Assignee desires to assume such obligations, on the terms and conditions hereinafter set forth; and

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in this Assignment, and other good and valuable consideration, the receipt and sufficient of which are hereby acknowledged, the parties agree as follows:

1.      Incorporation of Recitals.  All of the recitals are hereby incorporated into this Assignment.

2.      Assignment.  As of the Effective Date, Assignor assigns, transfers and conveys to Assignee all of Assignor's right, title, and interest in and to the Lease together with all of the rents, income, receipts, revenues, reserves, impounds, security deposits and all other benefits arising or issuing from or out of the Lease, and Assignee agrees to assume all of the obligations of Assignor under, with respect to or arising out of the Lease and all amendments, addendums and assignments thereto.

3.      Assumption.  As of the Effective Date, Assignee (a) accepts the assignment of the Lease, (b) assumes all of Assignor's obligations under the Lease arising from and after the Effective Date and (c) shall indemnify, defend and hold Assignor harmless from and against any and all losses, costs, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees incurred by Assignor as a result of any claim arising under the Lease and based on events or circumstances occurring from and after the Effective Date.

4.      Consent and Acknowledgement by Tenant.  Tenant hereby acknowledges this Assignment and consents to the assignment and assumption of the Lease as evidenced by this Assignment.

5.      Further Assurances. Assignor, Assignee and Tenant agree to execute, acknowledge and, where appropriate, deliver such other or further instruments of transfer, assignment or consent as such party may reasonably require to confirm the foregoing assignment and consent, or as may be otherwise reasonably requested to carry out the intent and purposes hereof.

6.      Security Deposit. Assignor hereby agrees that the security deposit being held by Assignor under the Lease shall be retained by Assignee and may be used by Assignee as needed to cure any defaults of Assignor prior to the Effective Date or of Tenant after the Effective Date.

7.      Binding Effect. This Assignment shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

8.      Governing Law. This Assignment shall be governed by, and construed in accordance with, the laws of the State of Texas.

9.      Counterparts. This Assignment may be executed in multiple counterparts each of which shall constitute an original assignment and all of which, when taken together, shall constitute a single Assignment.

10.     Venue. Each of the parties hereto: (a) consents to submit itself to the personal jurisdiction of any court of the State of Texas located in Tarrant County and any Federal court sitting in the State of Texas located in Tarrant County in the event any dispute arises out of this Assignment or the transactions contemplated hereby, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action relating to this Assignment or the transactions contemplated hereby in any court other than any court of the State of Texas located in Tarrant County or any Federal court sitting in the State of Texas located in Tarrant County.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, Assignor, Assignee and Tenant have executed this Assignment as of the date first written above.

**ASSIGNOR**:

**WAG Development, Ltd.,**
a Texas limited partnership

By:    HC Nursing Home, LLC,
       a Texas limited liability company,
       its general partner

       By:    _Rick Griffin_
              Rick Griffin, Manager


STATE OF ARKANSAS         §
                           §
COUNTY OF SEBASTIAN    §

       BEFORE ME, the undersigned, being a Notary Public in and for the State of Arkansas, on this day personally appeared Rick Griffin, Manager of HC Nursing Home, LLC, a Texas limited liability company, the general partner of WAG Development, Ltd., a Texas limited partnership, on behalf of said limited liability company and limited partnership.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE this _16_ day of November, 2022.



_Jana Mundy_
Notary Public - State of Arkansas
Print Name: _Jana Mundy_
My Commission Expires: _12-5-26_

*[Signatures continue on following pages]*

**ASSIGNEE:**

**KRS FORT WORTH, LLC,**
a Texas limited liability company

By:    KTFW – TX, LLC,
       a Wyoming limited liability company,
       its Manager

       By:    _____
            Joshua Kilgore, Authorized Representative


STATE OF ARKANSAS      §
                          §
COUNTY OF Sebastian    §

       BEFORE ME, the undersigned, being a Notary Public in and for the State of Arkansas, on this day personally appeared Joshua Kilgore, Authorized Representative of KTFW – TX, LLC, a Wyoming limited liability company, the manager of KRS Fort Worth, LLC, a Texas limited liability company, on behalf of said limited liability companies.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE this 21ˢᵗ day of November, 2022.

       [SEAL]

                         _____
                         Notary Public - State of Arkansas
                         Print Name: MARY ANN Justice
                         My Commission Expires: 1/19/2026

> MARY ANN JUSTICE
> NOTARY PUBLIC-ARKANSAS
> SEBASTIAN COUNTY
> COMMISSION NO. 12696701
> COMMISSION EXP. 1-19-2026

                 *[Signatures continue on following pages]*

**TENANT**:

**REMARKABLE HEALTHCARE OF FORT WORTH, LP**,
a Texas limited partnership

By:    LBJM, LLC,
        a Texas limited liability company,
        its general partner

        By:    _____
        Name:    Laurie Beth McPike
        Title:    President/CEO

STATE OF _Texas_____ §
                                      §
COUNTY OF _Tarrant_____ §

    BEFORE ME, the undersigned, being a Notary Public in and for the State of _Texas_____, on this day personally appeared _Laurie McPike_____, _President / CEO_ of LBJM, LLC, a Texas limited liability company, the general partner of Remarkable Healthcare of Fort Worth, LP, a Texas limited partnership, on behalf of said limited liability company and limited partnership.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _17th_ day of November, 2022.

    [SEAL]

                                 DIANE S AYOUBI
                                 Notary ID #131549083
                                 My Commission Expires
                                 April 30, 2026

                                 Notary Public - State of _Texas_____
                                 Print Name: _Diane Ayoubi_____
                                 My Commission Expires: _4.30.26_____

<u>Exhibit A</u>

<u>Premises</u>

A 120 licensed bed, all of which are Medicare certified and 91 of which are Medicaid certified, skilled nursing facility located at 6649 North Riverside Drive, Fort Worth, Texas 76137.

# Lease Agreement and Security Agreement

# By and Between

# WAG Development, Ltd.

# And

# Remarkable Healthcare of Fort Worth, LP

# Dated

_December 13_, **2010**

# LEASE AGREEMENT AND SECURITY AGREEMENT

**THIS LEASE AGREEMENT AND SECURITY AGREEMENT** made and entered into as of the 13th day of December, 2010, by and between **WAG Development, Ltd.**, a Texas limited partnership whose general partner is HC Nursing Home, LLC, hereinafter called "Landlord" and **Remarkable Healthcare of Fort** Worth, LP, a Texas limited liability company whose general partner is LBJM, LLC, hereinafter called "Tenant":

WHEREAS, Landlord has pursuant to proper governmental approval undertaken to construct a Facility and to thereafter lease said premises to Tenant.

NOW THEREFORE, it is agreed that premises are leased by Landlord to Tenant and are to be used and possessed by Tenant subject to the terms, provisions, covenants, agreements, and conditions of this lease.

**Definitions.** As used in this Agreement, the following terms shall have the meanings assigned below and/or the meaning in the Contract of Sale if not defined herein:

(a) "Commencement Date" shall mean the next day after the date the Demised Premises, as that term is defined below, passes the "Life Safety Inspection," conducted by the State where the Demised Premises is located, and can admit residents.

(b) "County" shall mean Tarrant County located in the State where the Demised Premises is located.

(c) "Demised Premises" shall mean the property described on **Exhibit A** attached hereto and all rights, privileges, easements, appurtenances belonging to or in any way pertaining to the premises and all building and other improvements now situated or to be erected on the premises and all furnishings, fixtures and equipment described on **Exhibit B** attached hereto and made a part hereof. The Demised Premise also has a common street address, assigned by the United States Postal Service or its designee, of 6649 North Riverside Drive, Fort Worth, Tarrant County, Texas 76137.

(d) "Electric Service Provider" shall mean City of Fort Worth, the utility company selected by Landlord to provide electric service to the Facility.

(e) "Facility" shall mean collectively the 91 Medicaid bed skilled nursing facility operated by Tenant on the Demised Premised and the equipment, the intangible personal property, the government authorizations, Supplies and all other assets of Tenant whether real, personal or mixed which are utilized in connection with the operation of the Facility.

2

(f)    "Impositions" shall mean all taxes, special assessments, general assessments and governmental charges of every description, including general and special, ordinary and extraordinary, of whatever name, nature and kind lawfully levied or assessed against the Demised Premises; federal, state, county, municipal taxing district or otherwise (including, without limitation, water and sewer charges), which ordinarily and regularly are levied on or charged against the Demised Premises (including, without limitation, any trade fixtures, machinery, equipment or related property installed or brought therein or thereon) and any taxes or assessments resulting from the shift (or increase) of the incidence of taxation now and ordinarily imposed upon realty, including, without limitation, any tax levied on this lease or the rents payable hereunder.

(g)    "Security Deposit" shall mean the amount of _____

_____ ($_____) for the full and faithful performance by Tenant of Tenant's covenants and obligations hereunder provided to Landlord of the Security Deposit.

(h)    "State" shall mean the State of Texas unless provided otherwise.

(i)    "Supplies" shall mean all supplies and inventory, including food, prescription medicine (to the extent same is owned by Tenant) and non-prescription medicine, towels, linens, cleaning material, supplies for the maintenance of the Facility and all other supplies used in the normal operation of the Facility.

1. **Description of Demised Premises.**  Landlord, in consideration of the rent to be paid

and the covenants and agreements to be performed by Tenant, does hereby lease,

demise and let unto Tenant and Tenant takes and accepts the Demised Premises.  The

Demised Premises are leased to Tenant for the purposes of operating a Facility all of

which shall be licensed in the name of Tenant.

The Demised Premises are leased to Tenant subject to all easements,

reservations, restrictions, and conditions of record affecting the real property which are

described on **Exhibit C** attached hereto and made a part hereof and any future

easements, reservations, restrictions and conditions placed on the real property by

Landlord to reasonably facilitate the construction of the Facility.

2. **Term.**  The term of this lease shall be twenty (20) years beginning on the _____ day

of _____, 20___ (Commencement Date) and ending on the _____ day

of _____, 20___, unless sooner terminated as herein provided.

3. **Rent.**  Tenant covenants and agrees to pay rent to the Landlord on the first (1st) day of

3

each and every month of the term of this Lease Agreement, in advance, via wire transfer to an account designated by Landlord, without notice, demand, offset, or deduction in lawful money of the United States of America, rent as follows:

| MONTHS | ANNUAL RATE | MONTHLY RATE | MULTIPLIER |
|---|---|---|---|
| 0-6 | | | 1.05 |
| 7-12 | | | 1.10 |
| 13-18 | | | 1.15 |
| 19-24 | | | 1.20 |
| 25 and thereafter | | | 1.25 |

The Tenant's rent rate, as shown hereinabove, shall change upon notification of change of Landlord's interest rate on debt service for financing of the Demised Premise. Landlord shall notify Tenant within ten (10) days of any notification received from its Lender of any interest rate changes as well as the resulting revised rental rate ("revised rental rate.")  The revised rental rate shall be determined by multiplying the initial rental rate amount found above times (X) the new interest rate factor found below in Paragraph 3.c.  The result shall equal the revised rental rate.  The formula for the revised rental rate calculation is:

> **Formula**:  $ \underline{a}$ X $\underline{b}$ = $ \underline{c}$
> a= initial rental rate
> b= Paragraph 3.c. factor
> c= revised rental rate

The rental rate may increase after the Commencement Date of this Lease Agreement due to additional costs incurred by Landlord.  Such additional expenditures may include, but are not limited to the following: direct out-of-pocket refinance costs, alterations to the Demised Premise required by any regulatory agency unless otherwise agreed to in this Lease Agreement, or any alterations, enhancements or repairs

requested by Tenant and agreed to by Landlord. The formula for increases due to an increase in the development cost is as follows:

> **Formula**:  $ a + b = $ c
> a= current rental rate
> b= amount of increase due to additional expenditures based on a twenty (20) year amortization at Landlord's then current debt service interest rate payable monthly.
> c= revised rental rate.

b.  Beginning the first day of month sixty-one (61) of the lease term, the rental rate, as shown and as calculated above, shall be ANNUALLY increased an additional two percent (2%), as set forth below:

> **Formula**: $ a x 102 = $ b
> a= rent in effect at the anniversary of the Commencement Date
> b= revised rental rate

c.  The Paragraph 3.c multiplier factor to be used in calculating rental amounts is shown below, adjacent to the corresponding interest rate.  The multiplier factor shall be determined based upon Landlord's then current interest rate on any money borrowed to finance all or any part of the Demised Premise.

In the event the Landlord's interest rate changes, then on the first (1st) day of the month following such change Tenant shall pay the revised rental rate as calculated.  Landlord shall calculate the revised rental rate in accordance with the interest rate change utilizing the multiplier factors shown below.  Fractional interest rates not listed herein are to be rounded up to the next higher interest rate shown. For example: 6.8% is to be rounded up to 7.0% and the corresponding multiplier factor applied.

| Landlord's Interest Rate | Factor |
|---|---|
| 5.00% | |
| 5.25% | |
| 5.50% | |
| 5.75% | |
| 6.00% | |
| 6.25% | |
| 6.50% | |

```
6.75%
7.00%
7.25%
7.50%
7.75%
8.00%
8.25%
8.50%
8.75%
9.00%
9.25%
9.50%
9.75%
10.00%
10.25%
10.50%
10.75%
11.00%
11.25%
11.50%
11.75%
12.00%
12.25%
12.50%
12.75%
13.00%
13.25%
13.50%
13.75%
14.00%
14.25%
14.50%
14.75%
15.00%
```

In the event the Landlord has no financing on the property the interest rate shall be adjusted quarterly and shall be calculated at 2.0 percentage points over the lesser of:

    i. The prime lending rate as published in the Wall Street Journal, Midwest Edition or successor publication, but no less than six percent (6.0%); or
    ii. The highest rate allowed by the State of Arkansas;
    iii. But the interest rate shall not be in excess of any applicable usury law or regulation of said state.

d. Tenant shall furnish to Landlord certain information as Landlord may reasonably require during the term of this Lease.  This information shall include the following:

     i    Facility census shall be provided to Landlord on the first day of each month between the hours of 8 a.m. 5 p.m. This information may be furnished by telephone or facsimile.

    ii    Quarterly financial statements on facility are to be provided within 30 days of period ending date.

   iii    Annual financial statements on facility and principals and Medicare and Medicaid cost reports are to be provided to Landlord within 30 days of the date prepared. Landlord shall be furnished copies of all revisions and adjustments to these cost reports.

   iv    Other financial information Landlord or Landlord's lender may reasonably require.

    v    A copy of the initial license and/or any subsequently issued license(s) shall be provided to Landlord within five (5) days of receipt by Tenant.

   vi    Currently valued Loss Runs on the insurance policies in effect for the previous five years. The Loss Runs shall be provided to Landlord annually within thirty (30) days of policy expiration date and shall be furnished on all policies covering real and personal property, general liability and professional liability.

e.   Should Commencement Date occur on a day other than the first (1st) day of a calendar month, the term of this lease shall begin on the first (1st) day of the next month. The first installment of rent shall be due and payable on or before the first day of that month and shall include pro rata rental for the days between Commencement Date and the first day of the month. Such installments of rent shall be paid to Landlord at the address specified in this lease or elsewhere as designated from time to time by written notice from Landlord to Tenant.

f.   If Landlord does not receive from Tenant any monthly rental payment within five (5) days after such payment is due, Landlord, at its option, may charge Tenant a late charge and handling fee equal to five percent (5%) of the monthly rental payment, which shall be deemed additional rent, and such late charge and handling fee shall be due and payable by Tenant to Landlord upon notice to Tenant. In addition, if any check of Tenant is returned to Landlord unpaid for any reason, Landlord, at his option, may thereafter require Tenant to pay rent and other charges payable hereunder by certified or cashier's check or by electronic transfer of funds.

**4.  Real Estate Taxes and Assessments**.

a. Tenant shall pay when due and payable and before delinquent, all Impositions against the Demised Premises during the term of this lease.  Tenant may pay any Impositions in installments, if payment may be so made without penalty, except that any Impositions which Tenant has elected to pay in installments shall be paid in full by Tenant prior to sixty (60) days before the expiration of the lease term.

b. Notwithstanding anything herein to the contrary and without in any way diminishing Tenant's obligations to pay the Impositions under the immediately preceding Section, Tenant shall, at the same time and in the same manner as the monthly rental payments become, deposit with Landlord an amount equal to one-twelfth (1/12) of the estimated Impositions for the applicable calendar year (as such amount may be estimated by Landlord and provided to Tenant prior to each calendar year) (each such deposit, individually a "Impositions Payment" and collectively the "Impositions Payments").  Landlord shall hold such estimated Impositions Payments in escrow to insure that Impositions are timely paid in full to the applicable taxing authority each calendar year. Upon Landlord's receipt of the year end statement for the Impositions from the applicable taxing authority, Landlord shall (i) cause the Impositions to be paid to the applicable taxing authority prior to delinquency and (ii) reconcile the total amount of Tenant's Impositions Payments for that calendar year with the actual amount of Impositions due for that particular calendar year.  If such reconciliation reveals that the total amount of Tenant's Impositions Payments are less than the amount of the Impositions finally assessed against the Demised Premises for that particular calendar year, Tenant shall remit the deficiency to Landlord within ten (10) days after Landlord's delivery to Tenant of a written statement for the deficiency.  If the reconciliation reveals that the total amount of Tenant's

8

Impositions Payments for that calendar year exceed the amount of the Impositions finally assessed against the Demised Premises for that particular calendar year, Landlord shall credit the overpayment to Tenant's next Impositions Payment due.

c. Tenant shall pay when due and before delinquent all taxes, charges and levies assessed against the personal property, trade fixtures and inventory owned by Tenant and placed, stored or used by Tenant in conjunction with the Demised Premises.

d. Impositions for any fraction of a tax year occurring at the commencement or the expiration of the term of this lease shall be prorated between the parties hereto upon the ratio of the number of days in each fractional tax year to 365 days.

e. Nothing contained in this lease shall require Tenant to pay any franchise, corporate, estate, inheritance, income, profits or revenue tax or any other tax, assessment or charge or levy upon the rent payable by Tenant under this lease; provided, however, that if at any time during the term of the lease under the laws of the State or any political subdivision thereof, methods of taxation prevailing at commencement of the term hereof shall be altered so as to cause the whole or any part of the real estate taxes or general assessment levied or assessed against the Demised Premises to be levied, assessed or imposed upon the rents received therefrom, then all such taxes and assessments shall be deemed to be included within the term "Impositions" for the purposes hereof and Tenant shall pay and discharge the same as herein provided with respect of payment of Impositions.

f. Tenant shall furnish to Landlord, within thirty (30) days after the date when any Impositions becomes due and payable, official receipts of the appropriate taxing authority or other evidence satisfactory to Landlord showing the payment thereof.

The failure of Tenant to furnish Landlord with such receipts or other evidence shall not be deemed a default unless Tenant fails to comply within fifteen (15) days after written request by Landlord.

g.  Tenant shall not be required to pay, discharge or remove any Impositions so long as Tenant shall contest the amount or validity of such Impositions by appropriate proceedings which shall operate to prevent or stay the collection of the Impositions so contested and if Tenant shall have provided Landlord with a bond satisfactory to Landlord in an amount equal to the unpaid amount so contested, together with all interest and penalties in connection therewith and all charges that may or might be assessed against or become a charge on the Demised Premises or any part thereof.

During such contest Landlord shall have no right to pay the Impositions contested except as provided herein.  Upon the termination of such proceedings, Tenant shall deliver to Landlord proof of the amount of the Impositions as finally determined and shall pay such Impositions, in which event the bond will be returned by Landlord to Tenant.

If such Impositions are not paid by Tenant upon termination of such proceeding, the bond may be cashed and applied by Landlord to the payment, removal and discharge of the Impositions, and the interest and penalties in connection therewith.  Any costs, fees or other liabilities accruing in any such proceedings and any deficiency shall be paid by the Tenant.

If during such proceeding, Landlord deems the bond deposited with it insufficient, Tenant shall upon demand deposit with Landlord such additional bond or bonds as Landlord may reasonably request, and upon failure of Tenant to do so, the bond or bonds heretofore deposited may be cashed and applied by Landlord to the payment, removal, and discharge of such Impositions, and the

10

interest and penalties in connection therewith and any costs, fees or other liability accruing in any proceeding, and the balance, if any, shall be returned to Tenant.

Tenant shall give Landlord written notice of any such contest and Landlord, at Tenant's sole expense, shall join in any such proceeding, if any law, rule or regulation shall so require.  Landlord shall not be subjected to any liability for the payment of any costs or expenses in connection with any proceedings and Tenant will indemnify and save Landlord harmless from any such costs and expenses.

h.  If Tenant shall default in the payment of any Impositions required to be paid hereunder by Tenant and Landlord elects to pay the Impositions, Tenant shall be liable to Landlord for such taxes and assessments paid by Landlord as additional rent, as well as any penalties occasioned by Tenant's default in the payment of same, which amount shall be paid by Tenant to Landlord upon demand plus interest at the highest rate allowed by law by State law ten (10) days after demand until such payment.

i.  Tenant may, at Tenant's expense, contest the collection or assessment of any Impositions.  If Tenant so elects to contest such amounts, Tenant shall, prior to the prosecution or defense of any such claim, notify Landlord in writing of its decision to pursue such contest.

5.  **Insurance**.  Tenant covenants and agrees that it shall, at its own cost, at all times during the term of this lease, procure and maintain certain insurance for benefit of Landlord, Tenant, Mortgagees, and other persons having an insurable interest AS THEIR INTEREST MAY APPEAR.  All insurance provided by Tenant shall be with such insurance company or companies listed in the A.M. Best Rating System as an A or A+ rating and with a financial strength rating of between 10 and 15.  Conditions, Terms and Forms or such insurance required by this lease are as follows:

ΓΓ

a.  Property Coverage

    i.  Property to be Insured:  All Improvements, i.e. buildings, canopies, paving, walkways, driveways or structures of any kind upon said Demised Premises, and all fixtures and personal property installed and/or supplied by Landlord and located thereon such Demised Premises.  Loss of Rents coverage for said Demised Premises damaged such that the property cannot be occupied shall be provided in an amount equal to, at least, one year's lease payments.

    ii.  Perils of Risk to Property to be Insured:  All Risk of Direct Physical Damage to all forms of properties heretofore mentioned.  Certain Common Exclusions such as Theft, Flood and Earthquake must be provided by Endorsement to the Primary Policy and/or by separate Difference in Conditions Insurance Policy(ies).

    iii.  Property Insurance Deductibles:  Deductibles under above mentioned Insurance shall be no more than $5,000 per each and every loss or as agreed in writing by Landlord, Mortgagees, and other persons with insurable interests with exception of Flood and Earthquake which may have deductibles of no greater than $25,000 per loss.

    iv.  Valuation of Property Insurance:  Coverage must be provided on a Replacement Cost and Agreed Value Valuation.  Replacement Cost shall be defined as the cost to repair or replace damaged items with like kind and quality without deduction for depreciation.  Agreed Value means that the insurance company agrees that the value purchased is adequate and waives coinsurance requirements.

    v.  Limits of Property Insurance: Full Replacement Cost and/or as Agreed All Perils.

b.  Liability

    i.  Commercial General Liability:
        1.  Limits of Liability:
            a.  $2,000,000 General Aggregate  Bodily Injury & Property Damage
            b.  $1,000,000 Each Occurrence  Bodily Injury & Property Damage
            c.  $1,000,000 Products/Completed Operations
            d.  $1,000,000 Personal and Advertising Injury
            e.  $ 500,000 Fire Damage Limit
            f.  $   50,000 Medical Expense
        2.  Coverage:
            a.  Premises/Operations
            b.  Products/Completed Operations
            c.  Independent Contractors
            d.  Contractual Liability
            e.  Broad Form Property Damage
            f.  Host Liquor Liability
        3.  Deductibles:
            a.  Maximum of $5,000 Each Occurrence

    ii.  Professional/Malpractice Liability:
        1.  Limits of Liability

                  a.  $25,000 Each Medical Incident
                  b.  $250,000 Annual Aggregate
        2.  Coverage:
                  a.  Includes or is silent on Punitive Damages
                  b.  Includes Physical Abuse, Sexual Assault and Abuse
        3.  Deductibles:
                  a.  Maximum of $5,000 Each Occurrence
    iii.  Automobile Liability
        1.  Limits of Liability
                  a.  $1,000,000 Each Occurrence Bodily Injury & Property Damage
        2.  Deductibles (BI/PD)
                  a.  Maximum of $5,000 Each Occurrence
    iv.  Rent Loss
        1.  Limits of Liability:  The amount of rent due under this lease for a period of up to 12 months because of business interruption
        2.  Deductibles:  None
c.  Workers Compensation & Employers Liability
    i.  Limits of Liability
        1.  Section A:     Statutory Limits
        2.  Section B:     $500,000 Each Accident $500,000 Disease  Policy Limit $500,000 Each Employee

However, Tenant shall have the option to non-subscribe to the workers compensation requirements as allowed by the State of Texas, so long as Tenant makes all required notifications to the State of Texas and to all employees as is required under State of Texas law.  If Tenant does elect to non-subscribe, Landlord recommends but does not require, that Tenant purchase and maintain insurance coverage in the form of an alternative workers compensation plan that has a maximum $5,000 deductible, and contains at least $1,000,000 limit of liability per person, and $10,000,000 per occurrence.

d.  Terms and Conditions
    i.  Insurance provided under Sections a. and b. hereinabove must name Landlord (and the property owner if different from Landlord) as a "Named Insured As Its Interest May Appear."  However, Landlord is in no way obligated to make premiums for such coverage in Sections 5. a. and b. hereinabove or any other coverage section.  Insurance provided under Section 5.c. must reflect that Landlord is a Certificate Holder.  Said coverage in Section 5.c must contain a Waiver of Subrogation Clause in favor of Landlord. Notice of Material Change or Cancellation must be provided in writing to Landlord at least thirty (30) days prior to any such action or change taking place.  Certificates shall have removed any such wording as "endeavor to mail" and "failure to mail such notice shall impose no obligations" and have replaced such wording as "the issuing company will send at least thirty (30) days written notice of policy changes and/or cancellations to the certificate holder."
    ii.  Coverage afforded under the terms of such policy or policies may be increased from time to time during the term, as Landlord may, in its reasonable discretion, require.
    iii.  All insurance provided shall be effective under valid and enforceable

policies issued by insurers which have been approved in writing by Landlord, which approval shall not be unreasonably withheld. Upon execution of this lease and thereafter not less than thirty (30) days prior to the expiration dates of the expiring policies furnished pursuant to this Section or any other Section of this lease, an original of the policies or certificates relating thereto bearing notations evidencing the payments of premiums or accompanied by other evidence satisfactory to Landlord of such payments shall be delivered by Tenant to Landlord.

iv.   Tenant may provide any insurance required by this lease in the form of a blanket policy, provided that Tenant shall furnish satisfactory proof that such blanket policy complies in all respects with the provisions of this lease, and that the coverage thereunder is at least equal to the coverage which would have been provided under separate policy covering only the Demised Premises.

v.   Landlord shall not be required to prosecute any claim against or contest any settlement proposed by any insurer provided that Tenant may, at its expense, prosecute any such claim or contest any such settlement. Landlord will join therein at Tenant's written request only upon receipt by Landlord of indemnity from Tenant against all costs, liabilities and expenses in connection with such prosecution or contest.

vi.   Insurance claims by reason of damage to or destruction of any portion of the Demised Premises shall be adjusted by Landlord. Any such proceeding for adjustment shall be governed by the provisions of this lease.

vii.   If Tenant shall default in the obtaining or maintaining of any insurance required thereunder, Landlord shall have the right, but not the obligation, to take whatever action necessary to pay all appropriate premiums to obtain or maintain such insurance, in which events any amount paid for premiums by Landlord shall be deemed additional rent and shall be paid by Tenant to Landlord upon demand, plus interest at the highest rate allowed by State law from ten (10) days after such demand until payment.

viii.   Each policy provided for in this Section shall contain an agreement that any loss otherwise payable thereunder shall be payable notwithstanding any act of negligence of Landlord or Tenant which might, absent agreement, result in the forfeiture in all or part of such insurance payment and notwithstanding the following:

1.   The occupation or use of the Demised Premises for purposes more hazardous than permitted by the terms of such policy.

2.   Any foreclosure or other action or proceeding taken pursuant to any provision of any mortgage or any event of default thereunder; or

3.   Any change in title or ownership of the Demised Premises.

**6. Security Deposit**. Landlord acknowledges receipt of $10,000.00 of the Security Deposit due, provided to Landlord for the full and faithful performance by Tenant of Tenant's covenants and obligations hereunder. The remaining amount of Security Deposit due shall be paid unto Landlord in conjunction with the payment of Rent, at the rate of

14

$1,000.00 per month until paid in full. Non-payment of the Security Deposit is an event of default under this lease. The Security Deposit shall not bear interest and shall not be considered an advance payment of rental or measure of Landlord's damages in case of default in the performance of any of the covenants and obligations to be performed by Tenant, including but not limited to the payment of all rent.

Landlord may, from time to time, without prejudice to any other remedy, use such Security Deposit to the extent necessary to make good any arrearage in rent as to which Tenant is in default and any other event of default, damage or deficiency in the reletting of the Demised Premises.

Following any such application of the Security Deposit, Tenant shall pay to Landlord upon written demand, the amount so applied in order to restore the Security Deposit to its original amount. Any balance remaining at the termination of this lease shall be returned by Landlord to Tenant but only after delivery of the entire possession of the Demised Premises to Landlord in accordance with this lease.

If Landlord assigns its interest in the Demised Premises during the lease term, Landlord shall assign the Security Deposit to the assignee and thereafter Landlord shall have no further liability for the return of such Security Deposit, provided the assignee shall agree to return the Security Deposit to Tenant in accordance with the terms of this lease. The provisions of the preceding sentence shall apply to every assignment made of the Security Deposit to a new landlord.

Tenant agrees that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that Landlord and its successors and assigns shall not be bound by any such actual or attempted assignment by Tenant.

7. **Net Lease-Nonterminability**.

   a. Except as otherwise expressly provided in this lease, this lease is intended as a "net lease" which the parties intend to yield "net" to the Landlord the rental as

15

provided for in this lease.

b.  To insure that the rent to Landlord is "net" to Landlord, Tenant agrees to timely pay as additional rent, during the term of this lease, the costs and expenses of the following:

    i.  All occupational licenses and other permits and licenses necessary in the operation of the business to be conducted on the Demised Premises;

    ii.  All utility charges for water, sewer, electricity, gas, telephone or any other service provided to or consumed on the Demised Premises;

    iii.  All sales and use taxes due as a result of the business conducted on the Demised Premises and any real and personal property taxes assessed against the property located on or used in connection with the Demised Premises;

    iv.  All Impositions levied on the Demised Premises provided in Section 4;

    v.  All premiums for all insurance required by this lease as provided in Section 5, and Tenant to hold Landlord harmless from any such cost or expense related thereto; and

    vi.  All maintenance costs, taxes, and other costs required to be paid by the Landlord and/or the owner of the Nursing Home Tract under that certain Development and Owners Agreement (Detention Facilities) dated May 12, 2010 by and between Landlord and Realty Capital Riverside, Ltd. ("Detention Agreement"), a copy of which is attached hereto as Exhibit D and made a part hereof.

## 8.  Use and Occupancy of Demised Premises.

a.  Tenant shall use the Demised Premises only for the Facility in a proper and legal manner and for no other purpose without the prior written consent of Landlord. Landlord and Tenant shall cooperate with each other in obtaining the necessary governmental licenses and permits required to operate the Facility. If, for reasons unforeseen at this time and not caused by any act or omission of Tenant, the use of the Demised Premises for the purpose stated herein shall become unlawful or not possible of performance, Landlord agrees that it will not unreasonably withhold its consent for the use of the Demised Premises for other lawful health related uses so long as any governmental license or permit is not adversely affected thereby.  Tenant agrees that Landlord's withholding of its consent in any such case because of the objection of any mortgagee of the Demised Premises

shall be deemed reasonable.

b. Tenant agrees to use and maintain the Demised Premises in a clean, careful, safe and proper manner and to comply with all applicable laws, ordinances, rules, orders and regulations of all governmental bodies whether state, federal or municipal, in a manner that the Demised Premises shall at all times qualify as a Facility under the laws and regulations of the State.

c. Tenant will not in any manner deface or injure the Demised Premises or any part thereof or overload the floors of the Demised Premises.  Tenant agrees to pay Landlord on demand for any damage to the Demised Premises caused by any negligence or willful act or any misuse or abuse (whether or not such misuse or abuse results from negligence or willful act) by Tenant or any of its agents, employees, licensees, or invitees or any other person not prohibited by Tenant from entering upon the Demised Premises.

d. Tenant agrees not to use or permit the Demised Premises to be used for any purpose prohibited by the laws of the United States or the State or by any ordinance of the city where the Facility is located or the County.  Tenant agrees not to commit waste or permit waste to be committed on or in the Demised Premises.  Tenant will not use the Demised Premises for any immoral or illegal purpose.

e. In no event will Tenant use, or permit the use, of the Demised Premises or any part thereof for any purpose which shall be deemed extra hazardous by hazard insurance companies or in a manner that will result in the cancellation of or extra premiums under any policy of insurance.

f. Tenant shall have the right to erect a sign on the exterior walls of the building or on part of the Demised Premises, securely attached to and parallel to said walls, subject to applicable laws and deed restrictions.  Tenant shall not erect any signs

17

other than customary trade signs identifying its business and shall not erect any sign on the roof or paint or otherwise deface the exterior walls of the Demised Premises.  Tenant shall remove all signs at termination of this lease and shall repair any damage and enclose any holes caused by such removal.

g.  Tenant acknowledges and agrees that Landlord has made no express or implied warranty, representation, undertaking or agreement as to the condition of the Demised Premises (except as otherwise set forth herein) or the ability of Tenant to use the Demised Premises in a manner for the purpose contemplated by Tenant.

h.  Tenant, at its sole cost and expense, shall maintain and operate the Demised Premises to comply in all respects with all governmental regulations issued by the State. Tenant will give Landlord immediate notice of any and all notices or other communications from any governmental authority with respect to any violation or suspected violation of any law, ordinance, order, rules, or regulation of any governmental body which if not timely cured could adversely effect Tenant's operation on the Demised Premises.  Tenant will take immediate steps to remedy any such violation, and if Landlord determines in his sole judgment that Tenant is not remedying such violation in a timely manner, Landlord shall have the right, but not the obligation, to remedy such violation, and the costs thereof shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord upon demand plus interest at the highest rate allowed by State law ten (10) days after such demand until payment.

i.  Tenant, at its sole cost and expense, agrees to maintain the Detention Improvements (as defined in the Detention Agreement) and fulfill any other obligations of Landlord and the owner of the Nursing Home Tract in accordance with and as required by the terms and conditions of the Detention Agreement.

18

**9. Acceptance of Leased Premises by Tenant**.

    a. Tenant has examined the premises and accepts the Demised Premises in the present condition and without any representation by Landlord as to the present or future condition of such property.

    b. Landlord warrants that the Demised Premises will be licensable as a Facility under the laws of the State.

        Landlord agrees to promptly correct all deficiencies regarding the physical plant of the Demised Premises noted in the first survey of the Facility by the appropriate licensing agency of the State.  Landlord shall not be liable except in the event of gross negligence or willful misconduct to Tenant or any of its agents, employees, licensees, service providers or invitees for any design or any defect in the Demised Premises or its mechanical systems and equipment which may exist or occur, and Tenant, with respect to itself and its agents, employees, licensees, service providers, and invitees, expressly assumes all risk of injury or damage to person or property, either proximate or remote, by reason of the condition of the Demised Premises.

**10.**      **Repair and Maintenance by Tenant**.

    a. Landlord shall not be required to make any repairs or improvements of any kind upon the Demised Premises.  Tenant shall keep the Demised Premises, including all fixtures and improvements installed by Tenant, in good and tenantable repair and condition and shall promptly make all necessary repairs and replacements thereto except those caused by fire or other casualty covered by the insurance on the Demised Premises under policies naming Landlord as an insured.

    b. All repairs and maintenance shall be at Tenant's sole expense but shall be under

the supervision and with the approval of the Landlord. Such repair and replacement shall be in quality and class equal to the original work and shall include without limitation repairs and all necessary replacements to the roof, foundation, underground or otherwise concealed plumbing, interior plumbing, exterior walls, windows, window glass, plate glass, doors, interior walls, columns or partitions, lighting, plumbing and sewage facilities, heating and air conditioning equipment, fire protection sprinkler system, and shall also include the reasonable care and landscaping and regular mowing of grass, adequate watering of grass, plants, shrubs and trees, and maintenance of any outside hard surfaced areas.

c.  Tenant shall keep the Demised Premises free of insects, rodents, and pests.

d.  If Tenant fails to make repairs or replacements required to be made by Tenant, then Landlord may, after ten (10) days written notice to Tenant, make such repairs. Tenant acknowledges and agrees that in the event of an emergency as determined by Landlord in its sole discretion, Landlord shall have the right, but not the obligation, to enter into the Demised Premises to make such emergency repairs as Landlord deems necessary. The cost for any such repairs shall be deemed to be additional rent hereunder and shall be paid by Tenant upon demand by Landlord plus interest at the highest rate allowed by State law from ten (10) days after such demand until payment.

e.  Tenant shall not allow, permit or cause:

    i.   The installation of underground storage tanks on the Demised Premises;
    ii.  The accumulation of tires, spent batteries, mining spoil, debris or other solid waste (except rubbish and containers for normally scheduled disposal in compliance with all applicable laws) on the Demised Premises;
    iii. The generation, accumulation, storage, release or threatened release of "hazardous substances" as defined in CERCLA, 42 U.S.C. Sections 9601 et. seq., and regulations pursuant thereto as now existing or hereinafter amended, on the Demised Premises. These items shall include but are not limited to polychlorinated biphenyls (PCB's) and asbestos, but does not include hazardous substances which are present

on the Demised Premises prior to date of this lease or normal or reasonable amounts of cleaning and pest control supplies necessary for normal maintenance of the Demised Premises which are properly stored in a safe and lawful manner;

iv.  The spilling or leaking of petroleum products on or from the Demised Premises (other than minimal quantities in connection with the operation of motor vehicles);

v.  The draining, filling or modification of wet lands (as defined by federal, state or local law, regulation, or order) on the Demised Premises;

vi.  The use of the Demised Premises for industrial, manufacturing or landfill purposes; or

vii.  Any other environmental condition with regard to the Demised Premises that could result in liability for an owner or operator of the Demised Premises.

f.  Tenant shall notify Landlord promptly upon Tenant learning that:

i.  Any duty described in this Section has been violated;

ii.  There has been a release or discharge or disposal of any substance or petroleum product on the property near the Demised Premises such that contamination of the Demised Premises is possible;

iii.  Radon gas or ureaformaldeahyde has been detected on or in the Demised Premises; or

iv.  The Demised Premises are subject of any third party claim or action, or threat thereof, because or on account of any environmental condition on or originating from the Demised Premises or arising in connection with the operation of the Demised Premises.  Tenant shall promptly provide Landlord with copies of all correspondence to or from third parties regarding environmental conditions on or originating from the Demised Premises.  Tenant shall return the Demised Premises to Landlord in substantially the same condition as when initially leased, improvements permitted hereunder are excepted.

g.  Tenant shall indemnify and hold harmless Landlord, Landlord's partners, employees, and agents, (the indemnified parties) from any and all liabilities including strict liability, penalties, demands, actions, costs and expenses (including without limitation, attorney fees from legal and response cost incurred in any monitoring or court costs) incurred or suffered by the indemnified parties or asserted by any third party against the indemnified parties, due to the breach of the Tenant of its obligations as set forth in this Section.  This indemnification clause shall survive the expiration or termination of this lease.

**11.**   **Mechanic's Liens**.

a.  Tenant will not permit mechanic's, laborer's or materialmen's liens to be placed upon the Demised Premises during the term hereof for any labor or material furnished to Tenant or claimed to have been performed on the Demised Premises by or at the direction or sufferance of Tenant.  Nothing in this lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any material for any specific improvement, alteration or repair of or to the Demised Premises or any part thereof.  Nothing in this lease shall be construed as giving the Tenant any right, power or authority to contract for or permit renting of any services or the furnishing of any materials that would give rise to the filing of any mechanic's or materialman's lien against the interest of the Landlord in the Demised Premises.

b.  In the case of the filing of any lien on the interest of the Landlord or the Tenant in the Demised Premises, Tenant shall cause the same to be discharged of record within sixty (60) days after filing of same.  If Tenant shall fail to discharge such mechanic's or materialman's lien, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by securing the discharge of such lien by deposit in court or by bonding.

c.  Any amount paid by Landlord for any of the aforesaid purposes, or for satisfaction of any other lien, cost or reasonable legal and other expenses of Landlord, including reasonable counsel fees in defending any such action or in securing the discharge of such lien, shall be deemed additional rent and shall be paid by Tenant to Landlord on demand, plus interest at the highest rate allowed by State law from ten (10) days after such demand until payment.

22

d. Tenant is reserved the right to contest the validity or amount of any such mechanic's or materialman's lien provided Tenant shall first have had such lien released of record.

12. **Alterations and Additions by Tenant**.  Tenant shall not make or allow to be made any openings in the roof or exterior walls of any building forming part of the Demised Premises or any alterations, improvements, or additions in or to the Demised Premises without first obtaining the written consent of the Landlord.  All alterations, additions, and improvements made to fixtures or other improvements placed in or upon the Demised Premises, whether temporary or permanent in character, and whether made by either party shall be deemed a part of the Demised Premises and property of the Landlord at the time the same are placed in or upon the Demised Premises, without compensation or offset in favor of Tenant.

13. **Additions or Alterations by Landlord**.  Landlord may consent to construct an addition to the Facility, at the request of the Tenant, provided Tenant has demonstrated to Landlord the necessity for the addition and the ability to pay the increased rental.  The consent of Landlord is further contingent upon the availability of adequate favorable financing.

14. **Liability of Landlord**.  Landlord shall not be liable to Tenant or to Tenant's employees, agents, licensees, or to visitors or business invitees to the premises or any other person whomsoever for:

a. Any injury or damage to personal property due to the Demised Premises or any part thereof becoming out of repair or by reason of any defect in or failure of pipes or wiring, or by the backing up of the drains or by the bursting or leaking of pipes, faucets and plumbing fixtures or by gas, water, steam, electricity or oil, leaking or escaping or flowing into or from the Demised Premises, or

23

b. Any loss or damage that may be occasioned by or through the acts or omissions of any other person whomsoever excepting only the willful misconduct or gross negligence of duly authorized employees and agents of Landlord, or

c. For any loss or damage to any property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, insurrection, war, court order, requisition or order of governmental authority, or any other matter beyond control of the Landlord.

Tenant agrees that all personal property upon the premises shall be at the risk of Tenant only, and that Landlord shall not be liable for any damage thereto or theft thereof.

**15.      Tenant's Indemnification of Landlord**.

a. Tenant shall indemnify, hold and save Landlord whole and harmless of, from and against all fines, suits, loss, costs, liability, claims, demands, actions, and judgments of every kind and character by reason of any breach, violation or nonperformance of any term, provision, covenant, agreement, or demands, actions, damages, costs, loss, liabilities, expenses and judgments suffered by, recovered from or asserted against Landlord on account of any injury or damage to person or property to the extent that any such damage or injury may be incident to, arise out of, or be remotely or proximately caused, in whole or in part, by any act, omission, negligence or misconduct on the part of the Tenant or any of its agents, servants, employees, contractors, patrons, guests, licensees, or business invitees or any other person entering upon the Demised Premises under or with the express or implied invitation or permission of Tenant or when any such injury or damage is the proximate or remote result of the violation by Tenant or any of its guests, contractors, patrons, licensees, or business invitees of any law, ordinance or governmental order of any kind, or when any such injury

24

or damage may, in any way, arise from or out of the occupancy or use by Tenant, its agents, servants, employees, contractors, patrons, guests, licensees or business invitees of the Demised Premises.

b. Tenant covenants and agrees that in case Landlord shall be made a party to any litigation commenced by or against Tenant or relating to this lease or to the Demised Premises, the Tenant will pay all judgments, costs and expenses, including reasonable attorney fees and court costs, incurred by or imposed upon Landlord by virtue of any litigation unless a judgment is rendered in such litigation against Landlord or its agents or employees based upon their negligence or willful misconduct.  The amount of all such judgments, costs and expenses, including attorney fees and court cost, shall be deemed additional rent and an obligation owing by Tenant to Landlord bearing interest at highest rate allowed by State law from ten (10) days after the date of demand.

**16.**     **Landlord's Right of Entrance**.  Landlord and it's authorized agents have the right to enter the Demised Premises at any reasonable time and after reasonable notice by telephone or otherwise for purpose of inspecting the general condition and state of repair of the Demised Premises or otherwise for any other legal reason or purpose. Landlord or it's authorized agents shall also have the right to enter the Demised Premises at any time without prior notice in the case of any emergency with respect to the Demised Premises.

This right of entrance given to Landlord shall be without liability to Tenant for damage or injury to property, persons or businesses and without effecting a constructive or actual eviction, or disturbance of Tenant's use or possession or giving rise to any claim for set off or abatement of rent.

Landlord shall have the right but not the obligation to enter the Demised Premises at least annually for the purpose of inspecting the general condition and state

25

of repair of the Demised Premises.

Landlord's right of entry shall also include a right of entry to show the Demised Premises to prospective tenants at reasonable hours and if they are vacated, to prepare them for preoccupancy.  Landlord and its authorized agents shall have the right within the final sixty (60) day period of the term of this lease to erect on or about the Demised Premises a customary sign advertising the Demised Premises for sale or lease.

Tenant shall, prior to taking possession of the Demised Premises, deliver one (1) complete set of keys to all exterior locks to the Demised Premises to Landlord for such emergency use and covenants that, if it shall thereafter change or add additional locks for any exterior doors to the Demised Premises, it will immediately provide new keys to Landlord.  Tenant covenants and agrees upon expiration of this lease to deliver to Landlord all keys to all locks installed in or on the Demised Premises and provide combinations to all safes remaining on the Demised Premises and leave equipment on the Demised Premises in clean and good condition.

**17.**      **Utility Service**.  Landlord shall provide at Landlord's expense on the Commencement Date of this lease the normal and customary utility service connections to the Demised Premises.  Tenant shall pay and be liable for the cost of all utility services, including but not limited to, connection charges, all charges for gas, water and electricity used on the Demised Premises, and for all electric light lamps or tubes and pay for all meter deposits.  Landlord shall not be liable for any interruption in the supply of any utility.

**18.**      **Assignment and Subletting**.

a. Tenant shall not, without prior written consent of Landlord, which consent shall not be unreasonably withheld:

      i.  Assign or in any manner transfer this lease or any estate or interest therein, or

     ii.  Permit any assignment of this lease or any estate or interest therein by operation of law, or

    iii.  Sublet the Demised Premises or any part thereof.

     Consent by Landlord to one or more assignments or subletting shall not operate as a waiver of Landlord's right as to any subsequent assignment or subletting.

b.  Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations under this lease shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's obligations under this lease.  Any amendment or modification to this lease with approved assignee subsequent hereto shall not release Tenant from any liability under the terms of this lease or under the terms of any such amendment.  Tenant agrees to promptly deliver to Landlord executed copies of all assignments or subletting documents as well as copies of any subsequent modifications or amendments thereto.

c.  If any event of default should occur while the Demised Premises or any part thereof are assigned or sublet, Landlord, in addition to any other remedies provided by law, may at its option collect directly from such assignee or subtenant all rents becoming due to Tenant under such assignment or sublease and apply such rents against any sums due Landlord from Tenant and Tenant hereby authorizes and directs any such assignee or subtenant to make such payments of rent directly to Landlord upon receipt of notice from Landlord.  No direct collection by Landlord from any such assignee or subtenant shall constitute a novation or a release of Tenant or any guarantor of Tenant from the further performance of Tenant's obligations.

d.  Receipt by Landlord of rent from any assignee, subtenant or occupant of the

Demised Premises shall not be deemed a waiver of this covenant.  Receipt by Landlord of any rents, any such assignee or subtenant is obligated to make, shall be a full complete release, discharge and acquittance to such assignee or subtenant to the extent of any amount of rent so paid to Landlord.  Landlord is authorized and empowered, on behalf of Tenant, to endorse the name of Tenant evidencing payment of rent, or proceeds therefrom.

e.  The merger, consolidation, reorganization or liquidation, or the sale or other transfer of the controlling percentage of the capital stock, or the sale of fifty-one percent (51%) of the value of the assets of Tenant (if Tenant is a corporation) or the transfer of any general partnership interest in Tenant or any limited partnership interest in excess of ten percent (10%) (if Tenant is a partnership) shall, for the purpose of this lease, constitute an assignment.

f.  Neither this lease nor the terms hereby demised shall be mortgaged, pledged or encumbered by Tenant, nor shall Tenant mortgage or pledge its interest in any sublease of the Demised Premises or the rentals payable thereunder.

g.  Any assignment, mortgage, pledge, hypothecation, encumbrance, subletting or licensing of this lease, the leasehold estate hereby created or the Demised Premises, or any portion thereof, either voluntary or involuntary, whether by operation of law or otherwise, in violation of the provisions of this lease shall be null and void, and shall further constitute default under this lease.

h.  Landlord shall have the right to transfer, assign and convey and hold in whole or in part the Demised Premises and any and all of its rights under this lease, and in the event Landlord assigns its right under this lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations.

i.  Jon E. McPike and Laurie B. English collectively do now and shall always own and control at least fifty-one percent (51%) of the membership interest of Tenant, and shall not, without prior written consent of Landlord, which consent may not be unreasonably withheld, assign, sell, encumber, or convey any of their membership interest in Tenant.

**19.**   **Fire or Other Casualty**.

a.  If the Demised Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give prompt notice to Landlord.

b.  If the Demised Premises shall be so damaged by fire or other casualty that the destruction is fifty percent (50%) or more in value of the Demised Premises or if any mortgagee under a mortgage or deed of trust should require that the insurance proceeds payable as a result of such fire or other casualty be used to retire the mortgage debt, Landlord may, at its option, terminate this lease by notifying Tenant in writing within sixty (60) days after the date of such damage. In this event, the rent shall be abated as of the date of such damage.

c.  If Landlord does not terminate this lease, Landlord shall within seventy-five (75) days after the date of such damage commence to repair and restore the Demised Premises.  Landlord shall proceed with reasonable diligence to restore the Demised Premises to substantially the same condition in which it was immediately prior to the happening of the casualty.  Landlord shall not be responsible for delays outside of its control.

d.  Landlord's obligation to restore the Demised Premises shall be limited to the amount of available insurance proceeds payable to Landlord.  Tenant agrees to pay all costs of such restoration not covered by insurance proceeds.  Landlord shall not be required to rebuild or repair any part of Tenant's property.

e.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or

injury to the business of Tenant resulting in any way from such damage or repair.

   f.  If the Demised Premises are damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of Tenant's agents, employees, visitors or business invitees, the rent hereunder shall not be diminished during repair of such damage, and Tenant shall be liable to Landlord for the cost and expense of such repair and restoration of the Demised Premises to the extent such cost and expenses are not covered by insurance proceeds.  Such uncovered costs or expenses shall be considered as additional rent and Tenant shall pay Landlord the uncovered costs thereof plus interest at the highest rate allowed by State law from ten (10) days after date of demand by Landlord.

**20.**    **Condemnation**.

   a.  If the whole or substantially the whole of the Demised Premises shall be taken for any public or quasi-public use by any governmental authority under law, ordinance or regulation or by right of eminent domain or should be sold to the condemning authority under threat of condemnation so as to render the Demised Premises no longer suitable for its intended purpose, this lease shall terminate as of the date when physical possession of the Demised Premises is taken by the condemning authority.

   b.  In the event the portion of the Demised Premises affected is used only for parking, this lease shall not terminate and Landlord shall have the option of providing an equivalent number of parking spaces on other property appurtenant to the Demised Premises.

   c.  If less than the whole or substantially the whole of the Demised Premises is taken or sold or the option in the preceding subsection is employed by Landlord, this lease shall not be terminated and the rent payable shall be diminished by an amount representing that part of said rent as shall properly be allocable to the

portion of the Demised Premises which was so taken or sold.  Landlord shall, at Landlord's sole expense, restore and reconstruct the Demised Premises to substantially the former condition to the extent that the same in Landlord's sole judgment may be feasible.  Landlord shall not be required to spend for such work any amount in excess of the amount received by Landlord as compensation for damages for the part of the Demised Premises taken (over and above amounts going to the mortgagee of the property taken).

d.   Landlord shall be entitled to receive all the compensation awarded upon a taking of any or all of the Demised Premises included in any award for the value of any unexpired term of this lease.  Tenant expressly waives all claims to any such compensation except that Tenant may prosecute any claim directly against the condemning authority for loss of business or relocation expenses or depreciation to, damage to or cost of removal of, or for the value of, personal property belonging to Tenant.

21.      **Waiver of Subrogation**.  Each party hereto waives any and every claim which arises or may arise in its favor against the other party hereto during the term of this lease or any extension or renewal thereof for any and all loss of or damage to any of its property to the extent that such loss or damage is recovered from a valid and collectible fire and extended coverage insurance policy to and not in limitation of any other waiver or release contained in this lease with respect to any loss or damage to the parties hereto.  Each party shall immediately give to each insurance company which has issued policies of fire and extended coverage written notice of the terms of this waiver and each party shall have the insurance policy properly endorsed, if necessary, to prevent the invalidation of the coverage of any insurance coverage by reason of this waiver.

22.      **Personal Property**.  All property of every kind and description which may in time

31

be placed in or on the Demised Premises by Tenant including, but not limited to, the equipment and inventory of Tenant shall be at Tenant's sole risk and Tenant by this Section waives any and all claim against Landlord for damage to any such goods, equipment or inventory. Tenant will promptly replace all worn out or obsolete personal property and will not, without prior written consent of the Landlord, remove from the Demised Premises any personal property except for temporary removal for repair or except to be replaced by Tenant by an article of equal suitability and value free and clear of any lien or security interest. Tenant may place other personal property on the Demised Premises and, except for properly replacing personal property, any such property shall be the property of Tenant except upon the Event of Default when it will become property of Landlord.  Tenant will release any and all rights to the Property, including Tenant's personal property, computers, vehicles, Supplies, and equipment utilized in the operation of the Facility, which shall become the property of Landlord and shall sign any documents or instruments Landlord deems necessary to accomplish such release.   Any personal property which is affixed by Tenant to the building or other improvements constituting the Demised Premises shall become the property of Landlord.

23.    **Surrender Upon Termination**.

   a.  At the termination of this lease, whether caused by lapse of time or otherwise, Tenant shall at once surrender possession of the Demised Premises and deliver said premises to Landlord in as good repair and condition as at commencement of Tenant's occupancy, reasonable wear and tear and damage or destruction by fire or other casualty excepted.  Tenant shall deliver to Landlord all keys to the Demised Premises.

   b.  If such possession is not immediately surrendered, Landlord may enter upon and take possession of the Demised Premises and expel or remove Tenant and any

other person who may be occupying said premises or any part thereof by force, if necessary, without having any civil or criminal liability therefore, but subject only to applicable law, rules or regulation of the appropriate governmental entity.

c. All alterations, additions or improvements, whether temporary or permanent in character, made in or upon the Demised Premises, either by Landlord or Tenant, shall remain on the Demised Premises.

d. All of Tenant's property may be removed by Tenant at the termination of this lease provided Tenant is not at that time in default under this lease. Such removal shall be accomplished in a good workmanlike manner so as not to damage the Demised Premises or the primary structure or structural qualities of the Demised Premises or the plumbing, electrical lines, or the utilities. If Tenant is in default, then Tenant will release any and all rights to the Demised Premises, including Tenant's personal property, computers, vehicles, Supplies, and equipment utilized in the operation of the Facility, which shall become the property of Landlord and shall sign any documents or instruments Landlord deems necessary to accomplish such release.

e. All Tenant's property not promptly removed after such termination shall be conclusively presumed to have been abandoned by Tenant and Landlord may, at its option, take over the possession of such property and either declare the same to be the property of Landlord by written notice to Tenant or, at the sole cost and expense of Tenant, remove the same or any part thereof in any manner that Landlord chooses and store the same without incurring liability to Tenant or any other person.

24.    **Events of Default.**

a. The following events shall be deemed to be events of default by Tenant under this lease:

33

   i.   Tenant shall fail to pay the rent, any additional rent, any Property Tax Payment, or any other sum required to be paid by Tenant, when due.

   ii.  Tenant fails to comply with any term, provision or covenant of this lease (other than the specific events set forth in this Section 24 as items i, ii, iii, iv, v, vi, vii, viii, ix, and x, for which no notice and cure period is applicable) and has not cured failure within thirty (30) days after written notice to Tenant. If default is such that it cannot be cured within such thirty (30) day period, such default shall not be deemed to continue if Tenant is delayed in or prevented from curing the default by any supervening cause or circumstances beyond the control of Tenant.

  iii.  Tenant or any guarantor of Tenant's obligations becomes insolvent, makes a transfer in fraud of creditors, commences any act of bankruptcy, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due.

  iv.  Tenant or any guarantor files a petition under the United States Bankruptcy Code or under any similar law or statute of the United States or any state or Tenant or guarantor is adjudged bankrupt or insolvent in proceedings filed against Tenant or guarantor; or a petition or answer proposing the adjudication of Tenant or guarantor as a bankrupt or its reorganization under any present or future federal or state bankruptcy or similar law is filed in any court and such petition or answer is not discharged or denied within thirty (30) days after filing.

   v.  A receiver or trustee is appointed for Tenant or all or substantially all of the assets of Tenant or any guarantor of the Demised Premises or any of Tenant's property located thereon.

  vi.  The Demised Premises is taken on execution or other process of law in any action against Tenant.

  vii.  Tenant abandons any substantial portion of the Demised Premises.

 viii.  Tenant's license is suspended or Tenant is otherwise prohibited by law, order, regulation, ordinance, rule or other legal authority from operating the Facility.

  ix.  Tenant fails to maintain Supplies on the Facility in quantities not less than required by applicable law and regulations.

   x.  Tenant commits an event of default under any one or more other lease agreement(s) or other agreement between Landlord and/or its affiliates and Tenant and/or its affiliates, and Tenant does not cure said default(s) within any applicable grace period set forth therein.

  xi.  If Tenant is subject to or has imposed against it, for the second time within any twenty-four (24) month period, a Category 1 or Category 2 remedy (as those terms are defined in 42 C.F.R. § 488.408(d) and (e) by the Texas Department of Aging and Disability Services, the Centers for Medicaid and Medicare Services, or any other state or federal agency authorized to regulate nursing facilities and/or impose such remedies or succeeding governing authorities or similar or replacement rules or regulations governing the same.

b.  If any event of default occurs, Landlord shall have the right at its election, then or at any time thereafter while such event of default continues, to pursue any one or more of the following remedies:

i. Terminate this lease in which event Tenant shall immediately surrender the Demised Premises to Landlord and if Tenant fails to do so, Landlord may, without prejudice to any other remedy Landlord may have for possession or arrearage in rent, enter upon and take possession of the Demised Premises and expel or remove Tenant or any other person who may be occupying said premises or any part thereof by force, if necessary, without having any civil or criminal liability therefore. Tenant agrees to pay Landlord on demand the amount of all loss and damage which Landlord suffers by reason of such termination whether through inability to relet the Demised Premises on satisfactory terms or otherwise, including, but not limited to, (a) all reasonable expenses necessary to relet the Demised Premises for a new tenant or tenants, including advertisement and brokerage fees and (b) any increase in insurance premiums caused by the vacancy of the Demised Premises.

Nothing contained in this lease shall limit or prejudice the right of Landlord to prove for and obtain in proceedings for bankruptcy or insolvency an amount equal to the maximum allowed by any statute or rule of law governing the proceedings in which damages are to be proved, whether the amount be greater, equal to or less than the amount of loss or damages referred to above.

ii. Enter upon and take possession of the Demised Premises and expel or remove the Tenant or any other person who may be occupying said premises or any part thereof without criminal liability. Without terminating this lease, Landlord may, but is not obligated to, relet the Demised Premises or any part thereof for the account of the Tenant in the name of the Tenant or Landlord or otherwise without notice to Tenant and for such term or terms and on such conditions and for such uses as Landlord in its absolute discretion determines. Landlord may collect and receive any rents payable by reason of such reletting and Tenant agrees to pay Landlord on demand all reasonable expenses necessary to relet the Demised Premises  for a new tenant, including advertisements and brokerage fees, and Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of such reletting. Landlord shall not be responsible or liable for any failure to relet the Demised Premises or any part thereof or for any failure to collect any rent due upon such reletting. No such reentry or taking of possession of the Demised Premises by Landlord shall be to terminate this lease unless written notice of such termination is given to Tenant.

iii. Enter upon the Demised Premises by force, if necessary, without having any civil or criminal liability and do whatever Tenant is obligated to do under the terms of this lease. Tenant agrees to reimburse Landlord on demand for any expenses which Landlord incurs in thus effecting compliance with Tenant's obligations under this Lease and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action, whether caused by the negligence of Landlord or otherwise.

c. No repossession of or reentering on the Demised Premises shall relieve Tenant or any Guarantor of its liabilities and obligations under this lease.  All such

liabilities and obligations survive such repossession or reletting.  In the event of any repossession or reentering on the Demised Premises or part thereof by reason of the occurrence of an event of default, Tenant will pay and continue to remain obligated to Landlord for the rent.

d.  No right or remedy herein conferred upon or reserved by Landlord is intended to be exclusive of any other right or remedy now or hereafter existing at law or equity.  In addition to the remedies provided in this lease, Landlord shall be entitled to injunctive relief in case of violation or attempted or threatened violation of any of the covenants, agreements, conditions or provisions of this lease or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this lease or any other remedy allowed to Landlord by law or equity.

25.     **No Implied Waiver**.  The failure of Landlord to insist upon the strict performance of any covenant or agreement or to exercise any option, right, power, or remedy contained in this lease shall not be construed as a waiver or a relinquishment thereof for the future.  The waiver of or redress for any violation of any term, covenant, agreement, or condition contained in this lease shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation.  No express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated.  A receipt by Landlord of any rent with knowledge of the breach of any covenant or agreement contained in this lease shall not be deemed to be a waiver of any other rights unless the same shall have been made  in writing and signed by Landlord.

26.     **Waiver by Tenant**.  Tenant hereby waives and surrenders for it and all claiming by, through, and under it, including all creditors of all kinds:

a.  Any right or privilege which it or any of them may have under any present constitution, statute, or rule of law to redeem the Demised Premises or to have a continuance of this lease for the term demised after termination of Tenant's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this lease, or after the termination of the term of this lease, and any exemption of the property from liability for debt or distress for rent, and

b.  The provisions of any law relating to notice and/or delay in levy of execution in case of eviction of a Tenant for nonpayment of rent.

27.  **Attorneys' Fees and Legal Expenses**.  If either party institutes any action or proceeding in court to enforce any lease provision or for damages by, on account of an alleged breach of this lease or for any other judicial remedy, the prevailing party shall be entitled to receive from the losing party all reasonable attorneys' fees and court costs in connection with such proceedings.

If any party names Landlord in any litigation because of some action, inaction, or fault of Tenant, or related in any manner to Tenant's use or occupancy of the Demised Premises, Tenant agrees to pay all of Landlord's reasonable attorney's fees and court costs in connection with such proceedings.

28.  **Landlord's Lien**.  In addition to the statutory landlord's lien and in order to secure payment of all rentals and other sums of money becoming due from Tenant, and to secure payment of damages or loss which Landlord may suffer by reason of the breach of Tenant of any covenant, agreement, or condition contained herein, Tenant grants to Landlord a security interest in and an express contractual lien upon all goods, wares, equipment, fixtures, furniture, improvements, Supplies, and all other personal property of Tenant, including replacement property and any proceeds therefrom, presently or which may hereafter be situated upon the Demised Premises (except for

such part of such property as may be exchanged, replaced, or sold from time to time in the ordinary course of Tenant's operations). No property shall be removed without the consent of Landlord, until all arrearage(s) in rent and all other sums of money due the Landlord shall first have been paid and discharged and all the covenants, agreements, and conditions of this lease have been fully complied with and performed by Tenant.

Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Demised Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements, Supplies, and other personal property of Tenant situated on the Demised Premises, without liability for trespass or conversion and Tenant waives any right to notice or hearing prior to such possession by Landlord. Landlord may sell the same at public or private sale, with or without having such property at the sale, after giving Tenant five (5) days notice of the time and place of any public or private sale.

Landlord or its assigns may purchase such items as may be offered for sale, unless otherwise prohibited by law. Any sale made pursuant to the provisions of this Section shall be deemed to have been a sale conducted in a commercially reasonable manner if held upon the Demised Premises after the time, place, and method of sale and general description of the type of property to be sold have been advertised in a newspaper of general circulation in the area of the Demised Premises at least three (3) times prior to the date of sale.

The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding, and selling of the property (including reasonable attorney's fees and other expenses,) shall be applied as a credit against the indebtedness secured by the security interest granted by this Section. Any surplus shall be paid to Tenant or as otherwise required by law; and the Tenant shall pay any deficiency forthwith.

Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a

financing statement and any continuation statement in form(s) sufficient to perfect the

security interest of Landlord in the property and proceeds thereof under the provisions of

the Business and Commerce Code in force in the State.  Landlord agrees to execute any

subordination statement required by Tenant in order to obtain financing for the purchase

of soft goods in order to furnish and equip the Demised Premises.

**29.**     **Subordination**.  This lease and all rights of Tenant hereunder are subject and

subordinate:

> i.  To any first lien mortgage or deed of trust, blanket or otherwise, which
>     does now or may hereafter affect the Demised Premises (and which may
>     also affect other property); and
> ii. To any and all increases, renewals, modifications, consolidations,
>     replacements, and extensions of any such mortgage or deed of trust.

This provision is hereby declared by Landlord and Tenant to be self operative

and no further instrument shall be required to effect such subordination of this

lease.  Tenant shall, however, upon demand by Landlord or the holder of any lien

on the Demised Premises, execute, acknowledge, and deliver to Landlord any

and all instruments and certificates that may be necessary or proper to more

effectively subordinate this lease and all rights of Tenant hereunder to any such

mortgage or deed of trust or to confirm or evidence such subordination.

b.  In the event the Tenant shall fail or neglect to execute, acknowledge, and deliver

any such subordination agreement or certificate, Landlord, in addition to any

other remedies it may have, may as the agent and attorney in fact of Tenant,

execute, acknowledge, and deliver the same.  Tenant irrevocably nominates,

constitutes and appoints Landlord as Tenant's proper and legal agent and

attorney in fact for such purposes. Such power of attorney shall not terminate on

disability of the principal.

c.  Tenant covenants and agrees, in the event any proceedings are brought for the foreclosure of any such mortgage or if the Demised Premises be sold pursuant to any such deed of trust, to attorn to the purchaser upon any such foreclosure sale or trustee's sale if so requested by such purchaser and to recognize such purchaser as the Landlord under this lease.  Tenant agrees to execute and deliver upon the request of Landlord or of any holder(s) of any of the indebtedness or other obligation secured by any of the mortgages or deeds of trust referred to in this Section or any such purchaser any instrument or certificate which, in the sole judgment of Landlord or of such holder(s) of such purchaser, may be necessary or appropriate in any such foreclosure proceedings or otherwise to evidence such attornment.

d.  Tenant hereby irrevocably appoints Landlord and the holders of the indebtedness or other obligations secured by the aforesaid mortgages and/or deeds of trust and any such purchaser jointly and severally the agent and attorney in fact of Tenant to execute and deliver for and on behalf of Tenant any such agreement or certificate, and Landlord, in addition to any other remedies it may have, may as the agent and attorney in fact of Tenant, execute, acknowledge, and deliver the same.  Tenant irrevocably nominates, constitutes and appoints Landlord as Tenant's proper and legal agent and attorney in fact for such purposes.  Such power of attorney shall not terminate on disability of the principal.

30.      **Quiet Enjoyment**.  So long as Tenant pays the rent when due and payable and keeps and fulfills all of the terms, covenants, agreements, and conditions to be performed by Tenant, Tenant shall at all times during the lease term peaceably and quietly enjoy the Demised Premises without any disturbance from Landlord, subject to the terms, provisions, covenants, agreements, and conditions of this lease.

31.     **Notice to Landlord and Mortgagee**.  In the event of any act or omission by Landlord which would give Tenant the right to damages from Landlord or the right to terminate this lease by reason of a constructive or actual eviction, Tenant shall not sue for such damages or exercise of any such right to terminate until:

a. It shall have given written notice of such act or omission to Landlord and to the holder(s) of the indebtedness or other obligations secured by any first mortgage or first deed of trust affecting the Demised Premises, if the name and address of such holder(s) shall previously have been furnished to Tenant, and

b. a reasonable period of time for remedying such act or omission shall have elapsed following the giving of such notice, during which time Landlord and such holder(s), either of them, their agents or employees, shall be entitled to enter upon the Demised Premises and do whatever may be necessary to remedy such act or omission.  During the period after the giving of such notice and during the remedying of such act or omission, the rent payable by Tenant for such period as provided in this lease shall be abated and apportioned only to the extent that any part of the Demised Premises shall be untenantable.

32.     **Holding Over by Tenant**.  Should  Tenant or any of its successors in interest continue to hold the Demised Premises after the termination of this lease, whether such termination occurs by lapse of time or otherwise, such holding over shall constitute monthly rental equal to one and one half times the monthly rent provided herein at the time of such termination hereof.  Tenant shall be regarded as a tenant from month to month; subject, however, to all of the terms, provisions, covenants, and agreements on the part of the Tenant hereunder.  No payments of money by Tenant to Landlord after the termination of this lease shall reinstate, continue, or extend the term of this lease and no extension of this lease after the termination thereof shall be valid unless the same

shall be reduced to writing and signed by both Landlord and Tenant.

33.     **Estoppel Certificate and Other Information**.  Tenant will, upon request by

Landlord or holder of any first mortgage on the Demised Premises, execute,

acknowledge, and deliver to Landlord or such holder, a statement in writing, certifying

that this lease is unmodified and in full effect (or, if there have been modifications, that

this lease is in full effect as modified, and setting forth such modification) and the dates

to which the rent has been paid, and either stating that to the knowledge of the signer of

such certificate no default exists hereunder or specifying each such default of which the

signer may have knowledge, it being intended that any such statement by Tenant may

be relied upon by any prospective purchaser or mortgagee of the Demised Premises.

34.     **Notices.**  Each provision of this lease, or of any applicable governmental laws,

ordinances, regulations, and other requirements with reference to the sending, mailing or

delivery of any notice or with reference to the making of any payment by Tenant to

Landlord, shall be deemed to be complied with if the following steps are taken:

    a.  All rent and other payments required to be made by Tenant to Landlord shall be

        payable to Landlord by electronic transfer of funds to a depository account

        established by Landlord or at such other address as Landlord may specify from

        time to time by written notice delivered in accordance herewith.

    b.  Any notice or document required to be delivered hereunder shall be deemed to

        be delivered, whether actually received or not, when deposited in the United

        States mail, postage prepaid, registered mail, return receipt requested,

        addressed to the parties hereto at the respective addresses set out opposite their

        names below, or at such other address as they have heretofore specified by

        written notice:

        LANDLORD:         Richard B. Griffin II
                          **WAG Development, Ltd.**

General Partner: HC Nursing Home, LLC
610 Towson Avenue
Post Office Box 2207
Fort Smith, Arkansas  72902
(479) 783-5191

TENANT:              Remarkable Healthcare of Fort Worth, LP
Attn: Laurie McPike
904 Emerald Blvd.
Southlake, TX 76092
(817) 308-6226

35.     **Real Estate Commissions**.  Each party hereto represents to the other that he

has not authorized any broker or finder to act on his behalf in connection with the lease

hereunder and that he has not dealt with any broker or finder purporting  to act on behalf

of any other party.  Each party hereto agrees to indemnify and hold harmless the other

from and against any and all claims, losses, damages, costs, or expenses of any kind or

character arising out of or resulting from any agreement, arrangement, or understanding

alleged to have been made by such party or on his behalf with any broker of finder in

connection with this lease or the transaction contemplated hereby.

36.     **Cleaning the Building**.  The Landlord agrees that the building will be "Broom

Cleaned" on or before the Commencement Date.  Cleaning and polishing of glass

surfaces, porcelain fixtures, and mopping and waxing of floors shall be the responsibility

of Tenant.  Tenant may elect to clean and wax prior to the Commencement Date so long

as said Tenant's cleaning schedule meets with the approval of Landlord.  Landlord shall

not be liable for expenditures made by Tenant to re-clean or re-wax the Demised

Premises in the event Tenant has performed those tasks prior to Commencement Date.

37.     **Joint Venture**:  This Lease Agreement is not and does not represent, create, or

otherwise form, any type of joint venture between Landlord and its affiliates and Tenant

and its affiliates.  Any intention to create a joint venture or partnership between Landlord

and its affiliates and Tenant and its affiliates is expressly disclaimed.

38.    **Guarantee Provision**.  If Tenant executes this lease in his individual capacity, then all such Tenants shall also execute the guarantee provisions of this Lease.  If the Tenant executing this lease is a corporation, then all stockholders of such corporation or limited liability company owning stock/membership interests at the time of the execution of this lease or any person thereafter acquiring stock or membership interests in said corporation or limited liability company shall execute the guarantee provisions of this lease.  Failure to comply with the provisions of this Section shall be an event of default under Section 24 of this lease.

39.    **Reservations of Landlord**.  Landlord, at its sole discretion, reserves the right to attach to and extend any and/or all on or offsite utilities which service the Demised Premises at any time during the Lease Term.  Further, Landlord reserves the right to cross the Demised Premises with new utilities or an extension of the existing utilities at any time during the Lease Term at Landlord's sole discretion.  Landlord shall coordinate all work with Tenant and shall locate its work so as to not unreasonably disrupt Tenant's use of the Demised Premises.

40.    **Periodic 10% Increases in Medicaid Beds.**

a.    Medicaid-certified nursing facilities are eligible for periodic Medicaid bed allocation increases based on high occupancy pursuant to Section 19.2322(f)(3) of Title 40 of the Texas Administrative Code (the "10% Rule").  Specifically, if the occupancy rate of a Medicaid-certified nursing facility is 90% or greater for nine (9) out of twelve (12) months (not necessarily nine <u>consecutive</u> months, so long as nine of the last twelve months have an occupancy rate of at least 90%), the facility may request a 10% increase in its Medicaid beds from the Texas Department of Aging and Disability Services ("DADS").  Following a 10% increase under the 10% Rule, a Medicaid-certified facility may reapply for

44

additional Medicaid beds as early as nine (9) months from the date DADS approves the previous increase under the 10% Rule.

b.  If Tenant operates a Medicaid-certified Facility under this Lease, Tenant agrees to be responsible for the application process with DADS so that the Medicaid beds are increased at every opportunity available under the 10% Rule, up to at least 120 total Medicaid beds in the Facility, and no more than the total licensed capacity of the Facility.  Specifically, Tenant will monitor its monthly occupancy rates, and every time the Facility's occupancy rate is 90% or greater for nine of the preceding twelve months, Tenant will notify DADS of this fact and will apply to DADS for a 10% increase in the Facility's Medicaid beds pursuant to the 10% Rule.

c.  Any and every time Tenant's monthly occupancy rates qualify for an increase pursuant to the 10% Rule, Tenant will notify Landlord in writing, and Tenant will apply to DADS for the 10% increase in writing with a copy to Landlord, within ten (10) days of the relevant occupancy data being first available (i.e., when monthly occupancy data is reported to DADS in Tenant's ordinary course of business pursuant to Tenant's reporting requirements under Section 19.2322(m) of Title 40 of the Texas Administrative Code.)

d.  Upon Tenant's request for additional Medicaid beds under the 10% Rule, Tenant agrees to use best faith efforts to cooperate with DADS in the approval process for the increase, and Tenant agrees to immediately notify Landlord of DADS' approval or denial of the increase request upon Tenant's receipt of such written decision from DADS.  In the event DADS denies the increase request, Tenant agrees to use best faith efforts to request reconsideration by DADS pursuant to Section 19.2322(k) of Title 40 of the Texas Administrative Code with a copy to Landlord, and Tenant shall timely file the reconsideration request with any

45

evidence appropriately raised for DADS' review at that time in an effort to have the increase request approved.  In the event any increase request is denied by DADS following reconsideration, Tenant's obligations shall continue under this Section 42 to apply for periodic increases under the 10% Rule at the next earliest opportunity when the 10% Rule requirements are met again by the Facility's occupancy data.

41.     **Waiver.**  In the event the Tenant should default under the lease or the lease should for any reason terminate, then the Medicaid and the Medicare contract, the then current facility license, any additional beds granted or to be granted by the State to the Facility, shall revert back to Landlord as both owner and operator, at the sole discretion of Landlord.  The Tenant, the principals of the Tenant, and all guarantors do by this instrument forever waive any interest in and relinquish any right to the skilled nursing facility beds whether Medicaid, Medicare, Private Pay or other type, as well as for any subsequent beds issued, added or approved for this Facility (the "beds") and agree that the beds are and shall remain the sole property of Landlord, at its sole discretion.

The Tenant, the principals of the Tenant, and all guarantors understand that by agreeing to this Section of the lease they are forever waiving any interest in and relinquishing any rights and are agreeing not to assert any interest or right in the beds granted to the Facility, or beds that are eligible or earned by or to the Facility but un-issued to the Facility.

42.     **Governing Law and Venue of Actions**. This Agreement will be governed by the laws of the State and all parties consent to venue in the County where the Demised Premises is located.

43.     **Severability**. Each and every covenant and agreement contained in this lease is, and shall be construed to be, a separate and independent covenant and agreement.

46

If any term or provision of this lease or the application thereto any person or circumstances shall be determined invalid and unenforceable, the remainder of this lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected hereby.

44.     **No Merger**.  There shall be no merger of this lease or of the leasehold estate hereby created with the fee estate in the Demised Premises or any part thereof by reason of the fact the same person may acquire or hold, directly or indirectly, this lease or the leasehold estate created or any interest in this lease or in such leasehold estate as well as the fee estate in the Demised Premises or any interest in such fee estate.

45.     **Force Majeure**.  Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, such party shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations, or restrictions or any other causes of any kind whatsoever which are beyond the control of each party.

46.     **Gender.**  Words of any gender used in this lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

47.     **No Representation**.  Landlord or Landlord's agents have made no representations or promises with respect to the Demised Premises except as herein expressly set forth and no rights, easements, or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this lease.

48.     **Entire Agreement**.  This lease sets forth the entire agreement between the parties and no amendment or modification of this lease shall be binding or valid unless expressed in writing executed by both parties hereto.

47

49.     **Section Headings**.  The Section headings and numbering contained in this lease are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several Sections hereof.

50.     **Authority**.  Each person who executes this Agreement represents and warrants that he or she has the authority of the shareholders or members or of the general or limited partners of said entity to do so, and agrees to indemnify and hold the Landlord harmless from any such claim that such authority did not exist.

51.     **Recitals**.  All of the recitals and preambles hereinabove set forth, as well as any Exhibit hereto, are hereby incorporated into and made a part of this Agreement.

52.     **Counterparts**.  This Agreement may be executed in two (2) or more counterparts, which may be photocopied into an electronic file, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof to produce or account for more than one counterpart.

53.     **Binding Effect**.  All of the covenants, agreements, terms and conditions to be observed and performed by the parties hereto shall be applicable to and binding upon their respective heirs, personal representatives, successors, and, to the extent assignment is permitted hereunder, their respective assigns.

IN WITNESS WHEREOF, Landlord and Tenant have executed this lease as of the date first above written.

**LANDLORD**
WAG Development, Ltd.
By its General Partner: HC Nursing Home, LLC

Rick Griffin
Manager

**TENANT**

Remarkable Healthcare of Fort Worth, LP

By: LBJM, LLC
Its: General Partner

By: _____
Laurie McPike, President

**GUARANTORS:**

_____
Jon E. McPike

_____
Laurie McPike

Remarkable Healthcare, LLC

By: _____
Laurie McPike

49

## ACKNOWLEDGEMENTS

STATE OF ARKANSAS)

　　　　　　　　　　　　　　　） §

COUNTY OF SEBASTIAN)

　　　　On this 14th day of December, 2010, before me, the undersigned, a Notary Public, duly qualified and acting in and for the county and state aforesaid, appeared in person **Rick Griffin**, to me personally well known, who stated that he was the Manager of HC Nursing Home, LLC the General Partner of **WAG Development, Ltd.**, a Texas limited partnership and was duly authorized in his capacity to execute the foregoing instrument and for and in the name and behalf of the limited partnership, and further stated and acknowledged that he had so signed, executed, and delivered said foregoing instrument as the free act and deed of said limited partnership for the consideration, uses, and purposes therein mentioned and set forth.

　　　　IN TESTIMONY WHEREOF, I have hereunto set my hand and seal the day and year stated above.

Notary Public

My Commission expires: 12-5-18

(Notary stamp or seal)

STATE OF TEXAS)

　　　　　　　　　　　　　　　） §

COUNTY OF Tarrant)

　　　　On this 13 day of December , 2010, before me, the undersigned, a Notary Public, duly qualified and acting in and for the county and state aforesaid, appeared in person **Laurie McPike**, to me personally well known, who stated that she was the President of LBJM, LLC, the General Partner of **Remarkable Healthcare of Fort Worth, LP**, a Texas limited partnership and was duly authorized in her capacity to execute the foregoing instrument and for and in the name and behalf of the limited partnership, and further stated and acknowledged that she had so signed, executed, and delivered said foregoing instrument as the free act and deed of said limited partnership for the consideration, uses, and purposes therein mentioned and set forth.

　　　　IN TESTIMONY WHEREOF, I have hereunto set my hand and seal the day and year stated above.

Notary Public

My Commission expires: 6/27/2013

(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

## ACKNOWLEDGEMENTS

STATE OF TEXAS                    )'

COUNTY OF _Tarrant_ )

On this day before the undersigned, a Notary Public duly qualified and acting in and for the county and state aforesaid personally appeared **Jon E. McPike**, to me well known to be the person whose name appears in the foregoing instrument, and stated that he has executed the same for the consideration, uses and purposed therein stated.

In witness whereof, I hereunto set my hand and seal on this _13_ day of _December_
_____, 20_10_.

_April M. Strube_
Notary Public

My Commission Expires:

_6/27/2013_
(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

STATE OF _Texas_ )

COUNTY OF _Tarrant_ )'

On this day before the undersigned, a Notary Public duly qualified and acting in and for the county and state aforesaid personally appeared **Laurie McPike**, to me well known to be the person whose name appears in the foregoing instrument, and stated that she has executed the same for the consideration, uses and purposed therein stated.

In witness whereof, I hereunto set my hand and seal on this _13_ day of _December_
_____, 20_10_.

_April M. Strube_
Notary Public

My Commission Expires:

_6/27/2013_
(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

## GUARANTY

The undersigned (the "Guarantor"), hereby guarantees to each of the Landlords identified below (the "Landlord" or "Landlords", as the context so requires) the complete and punctual payment and performance of all of the obligations of those entities designated or identified below (the "Tenant" or "Tenants", as the context so requires), under those certain lease agreements set out and identified below (the "Lease" or "Leases", as the context so requires), including, without limitation, the payment of all rent and other sums owed by the Tenants to the Landlords identified below.  The identity of the Landlords, Tenants, and Leases are as follows:

Landlord   **WAG Development, Ltd.**
Tenant     **Remarkable Healthcare of Fort Worth, LP**
Date       _December 17th_ , **2010**

This instrument is a guarantee of payment and performance, not of collectability. Guarantor's liability under this Guaranty for the complete and punctual payment of all rent and other sums under each of the Leases designated above (the "Obligations") shall arise immediately and automatically without notice, demand, or any other action by Landlord.  In addition, Guarantor shall pay, and upon request of any Landlord shall promptly reimburse that Landlord, for all costs and expenses (including, without limitation, court costs, collection charges, and attorneys' fees and expenses) incurred by any Landlord in connection with the evaluation, protection, assertion, or enforcement of a Landlord's rights, powers, or remedies under this Guaranty.

Without notice to Guarantor and without releasing, discharging, impairing, or otherwise affecting any obligation of Guarantor under this Guaranty, a Landlord may, by action or inaction, in its sole, absolute, and unlimited discretion:  agree with a Tenant to amend or modify a Lease; compromise, settle, extend the time for payment or performance of all or any part of the Obligations or any other obligations guaranteed by this Guaranty for the benefit of its Tenant or any other guarantor; release any Tenant or any other guarantor from its liability for all or any part of the Obligations or any such other obligations; release all or any part of security for all or any part of the Obligations or any such other obligations; modify any documents or instruments relating to the Obligations or any such other obligations (except this Guaranty); extend the time for making any deposit or for granting a security interest in property securing or intended to secure all or any part of the Obligations; make advances for the purpose of performing any obligation of a Tenant under any of the Leases designated above that may be in default at any time; refuse or fail to enforce any or all of Guarantor's rights, powers, or remedies under any Lease or this Guaranty; assign or transfer its interests in, to, and under any Lease and/or any amendments thereto; or deal with any Tenant or any other guarantor as if this Guaranty were not in effect.  It is the intent of the parties that Guarantor shall remain liable for payment and performance of all of the Obligations and all other obligations guaranteed hereby, notwithstanding any act or thing that might otherwise operate as a legal or equitable discharge of a surety.

Should any part of a payment to or for the benefit of a Landlord and with respect to the Obligations be invalidated, declared to be fraudulent or preferential, set aside, or required for any reason to be repaid or paid over to a trustee, receiver, or other person under any insolvency law or any other law or rule of equity, to the extent of that payment or repayment, the Obligations (or the part thereof) intending to have been satisfied shall be revived and continued in full force and effect as if that payment had not been made, and Guarantor shall continue to be primarily liable for that obligation.

2

This Guaranty will be governed by the laws of the State and all parties consent to venue in the County where the Demised Premises is located as defined in the lease.

IN WITNESS WHEREOF, Guarantor executes and delivers this Guaranty as of this the 13th day of December, 20 10.

**GUARANTOR**

_____
Jon E. McPike

WITNESS:

**AND**

_____
Laurie B. English

WITNESS:

**AND**

Remarkable Healthcare, LLC

_____
Laurie McPike, Manager

WITNESS:

3

<u>**ACKNOWLEDGMENTS**</u>

STATE OF _Texas_ )

COUNTY OF _Tarrant_ )'

     On this day before the undersigned, a Notary Public duly qualified and acting in and for the county and state aforesaid personally appeared **Jon E. McPike**, to me well known to be the person whose name appears in the foregoing instrument, and stated that he has executed the same for the consideration, uses and purposed therein stated.

In witness whereof, I hereunto set my hand and seal on this _13_ day of _December_ _____, 20 _10_.

_April M. Strube_
Notary Public

My Commission Expires:

_6/27/2013_
(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

STATE OF _Texas_ )

COUNTY OF _Tarrant_ )'

     On this day before the undersigned, a Notary Public duly qualified and acting in and for the county and state aforesaid personally appeared **Laurie McPike**, to me well known to be the person whose name appears in the foregoing instrument, and stated that she has executed the same for the consideration, uses and purposed therein stated.

In witness whereof, I hereunto set my hand and seal on this _13_ day of _December_ _____, 20 _10_.

_April M. Strube_
Notary Public

My Commission Expires:

_6/27/2013_
(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

4

## ACKNOWLEDGEMENT

STATE OF TEXAS,     )
                     ) §
COUNTY OF Tarrant   )

On this ___13___ day of ___December___, 20_1_0_, before me, the undersigned, a Notary Public, duly qualified and acting in and for the county and state aforesaid, appeared in person **Laurie McPike**, to me personally well known, who stated that she was the Manager of **Remarkable Healthcare, LLC**, a Texas limited liability company and was duly authorized in her capacity to execute the foregoing instrument and for and in the name and behalf of the limited liability company, and further stated and acknowledged that she had so signed, executed, and delivered said foregoing instrument as the free act and deed of said limited liability company for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal the day and year stated above.

_____
Notary Public

My Commission expires: 6/27/2013

(Notary stamp or seal)

APRIL M. STRUBE
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-27-2013

5

EXHIBIT A

LEGAL DESCRIPTION

Lot 2R-2-1, Block A, RIVERSIDE COMMERCIAL ADDITION, an Addition to the City of Ft. Worth, Tarrant County, Texas, according to plat recorded under Clerk's File No. D210097021, Deed Records of Tarrant County, Texas

**EXHIBIT B**

**LISTING OF PERSONAL PROPERTY LISTING OF FURNITURE
AND FIXED AND MOVABLE EQUIPMENT**

**EXHIBIT C**

**LIST OF ALL EASEMENTS, RESERVATIONS, RESTRICTIONS,
AND CONDITIONS AFFECTING THE DEMISED PREMISES**

# Chicago Title Insurance Company

## 44-901-100-TNB3843

### OWNER'S POLICY OF TITLE INSURANCE (T-1)
Issued by
### Chicago Title Insurance Company

**Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, CHICAGO TITLE INSURANCE COMPANY, a Nebraska corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from:
    (a) A defect in the Title caused by:
        (i) forgery, fraud, undue influence, duress, incompetency, incapacity or impersonation;
        (ii) failure of any person or Entity to have authorized a transfer or conveyance;
        (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized or delivered;
        (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
        (v) a document executed under a falsified, expired or otherwise invalid power of attorney;
        (vi) a document not properly filed, recorded or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
        (vii) a defective judicial or administrative proceeding.
    (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
    (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.
        The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
    (d) Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or materials having its inception on or before Date of Policy.
3. Lack of good and indefeasible Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
    (a) the occupancy, use or enjoyment of the Land;
    (b) the character, dimensions or location of any improvement erected on the Land;
    (c) subdivision of land; or
    (d) environmental protection
    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.
6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9. Title being vested other than as stated in Schedule A or being defective:
    (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state

insolvency or similar creditors' rights laws; or

(b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws by reason of the failure of its recording in the Public Records:

    (i)  to be timely, or

    (ii)  to impart notice of its existence to a purchaser for value or a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

---

Issued by:
CHICAGO TITLE INSURANCE COMPANY
909 FANNIN, SUITE 200
HOUSTON, TX 77010

**Chicago Title Insurance Company**

By: _____
                       President

ATTEST:
_____
                       Secretary

Countersigned: _____
    David W. Cleveland   Authorized Signature
    Commercial Escrow Officer
    713-653-6125

## SCHEDULE A

**Name and Address of Title Insurance Company:**

CHICAGO TITLE INSURANCE COMPANY
P.O. Box 45023
Jacksonville, FL 32232-5023

**File No.: TNB3843**　　　　　　　　　　**Policy No.: 44-901-100-**　　**TNB3843**

**Address for Reference only:**

TARRANT - LOT 2R-2-1, BLOCK A RIVERSIDE
FORT WORTH, Texas

**Amount of Insurance: $8,266,000.00**　　**Premium: $29,201.00**

**Date of Policy:** June 23, 2010　　　　　　　2:38 PM

1. Name of Insured:
WAG Development, Ltd.

**2. The estate or interest in the Land that is insured by this policy is:**
Estate or interest shown on page 2

3. Title is insured as vested in:
WAG Development, Ltd.

4. The Land referred to in this policy is described as follows:
Property fully described on attached Exhibit "A"

GP# TNB3843
Owner Policy No.: 44-901-100-   TNB3843

## ESTATE OR INTEREST

Tract 1: FEE SIMPLE ESTATE, subject to, and the Company does not insure title to, and excepts from the description of the land, coal, lignite, oil, gas and other minerals in, under and that may be produced from the land, together with all rights, privileges, and immunities relating thereto.

Tract 2: Non-Exclusive Easement Estate for Access as created by that certain Access, Construction, Easement And Escrow Agreement, dated May 12, 2010, by and between WAG DEVELOPMENT, LTD. and REALTY CAPITAL RIVERSIDE, LTD., a Texas limited partnership, filed for record under Clerk's File No. D210113000, Deed Records of Tarrant County, Texas.

GF# TNB3843
Owner Policy No.: 44-901-100-   TNB3843

## DESCRIPTION

Exhibit "A"

TRACT 1:

Lot 2R-2-1, Block A, RIVERSIDE COMMERCIAL ADDITION, an Addition to the City of Ft. Worth, Tarrant County, Texas, according to plat recorded under Clerk's File No. D210097021, Deed Records of Tarrant County, Texas.

TRACT 2:

Non-Exclusive Easement Estate for Access as created by that certain Access, Construction, Easement And Escrow Agreement, dated May 12, 2010, by and between WAG DEVELOPMENT, LTD. and REALTY CAPITAL RIVERSIDE, LTD., a Texas limited partnership, filed for record under Clerk's File No. D210113000, Deed Records of Tarrant County, Texas.

SCHEDULE B

File No.: TNB3843          Policy No.: 44-901-100-     TNB3843

EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of leases and easements, if any, shown in Schedule A, and the following matters:

C    1. *The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception.):*

Covenants as recorded in Cabinet A, Slide 12900, and in Volume 7539, Page 1885, Deed Records of Tarrant County, Texas,, but omitting any covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said convenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

E    2. *Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements.*

J    3. *Homestead or community property or survivorship rights, if any, of any spouse of any insured.*

K    4. *Any titles or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,*
       *a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or*
       *b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or*
       *c. to filled-in lands, or artificial islands, or*
       *d. to statutory water rights, including riparian rights, or*
       *e. to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.*

M    5. Standby fees, taxes and assessments by any taxing authority for the year 2010 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, *Texas Tax Code,* or because of improvements not assessed for a previous tax year.

W    6. *The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception.):*

Deed of Trust dated June 17, 2010, filed for record on June 23, 2010, under Tarrant County Clerk's File No. 210151932, executed by WAG Development, Ltd., to Randall B. Durant, Trustee, to secure the payment of one note of even date therewith in the original principal sum of $8,266,000.00, payable to the order of JPMorgan Chase Bank, N.A.

AS    a. Intentionally Deleted

      b. Notice(s) of any law, ordinance, permit, fees or governmental regulation (including building and zoning) restricting, regulating,

HOPB108 Rev 06/08 GRG

GF# TNB3843

Owner Policy No.: 44-901-100-   TNB3843

## SCHEDULE B (continued)

prohibiting or relating to the occupancy, use, or enjoyment of the property, as noted and/or shown on plat filed for record under Clerk's File No. D210097021, Deed Records of Tarrant County, Texas.

c. A ten foot (10') wide easement along the North, East, West and West portion of the South sides of the property for public utilities, as shown by plat recorded under Clerk's File No. D210097021, Deed Records of Tarrant County, Texas, and as shown on survey dated June 11, 2010, prepared by JPH Land Surveying, Inc., under the supervision of Jewel Chadd, R.P.L.S. No. 5754.

d. A ten foot (10') wide private drainage easement along a portion  of the East and South side(s) of the property, as shown by plat filed  for record under Clerk's File No. D210097021, Deed Records of Tarrant County, Texas, and as shown on survey dated June 11, 2010, prepared by JPH Land Surveying, Inc., under the supervision of Jewel Chadd, R.P.L.S. No. 5754.

e. A twenty foot (20') building setback line along the East side(s), as shown by plat recorded in Cabinet A, Slide 11734, Deed Records of Tarrant County, Texas.

f. A twenty foot (20') building setback line along a portion of the West side(s), as shown by plat recorded in Cabinet A, Slide 11734, Deed Records of Tarrant County, Texas.

g. Intentionally Deleted

h. The following matters as shown by survey plat dated June 11, 2010, prepared by JPH Land Surveying, Inc., under the supervision of Jewel Chadd, R.P.L.S. No. 5754.

1) location of fences running North and South in the West portion of the property; and
2) building set backs per the city of Fort Worth as noted on survey
Terms, conditions, stipulations of, and easements granted by Access, Construction, Easement And Escrow Agreement filed for record under Clerk's File No. D210113000, Deed Records of Tarrant County, Texas.

j. Interest in all oil, gas, and other minerals as reserved in deed recorded under Clerk's File No. D210112998, Deed Records of Tarrant County, Texas, as affected by waiver of surface rights contained therein. Title to said mineral interest has not been checked subsequent to the date of recording of the referenced instrument.

k. Easement for existing utilities reserved by City of Fort Worth Ordinance No. 17404-02-2007, a certified copy of which is flied for record under Clerk's File No. D210112997, Deed Records, Tarrant County, Texas.

l. Terms, conditions, and stipulations of Development and Owner's

GF4 TNB3843
Owner Policy No.: 44-901-100-   TNB3843

## SCHEDULE B (continued)

Agreement (Detention Facilities) by and between WAG Development, LTD. and Realty Capital Riverside, LTD., recorded under Clerk's File No. D210113001, Deed Records of Tarrant County, Texas.

m. Intentionally Deleted

.1. Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the Insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of Tarrant County, Texas, prior to the date hereof.

Liability hereunder at the date hereof is limited to $$8,266,000.0. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sums plus the amount actually expended by the Insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this Policy, will be deemed made as of the date of this Policy. In no event shall the liability of the Company hereunder exceed the face amount of this Policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this Policy.

# EXCLUSIONS FROM COVERAGE

Case 4:24-cv-00037-O   Document 33-1   Filed 02/17/24   Page 74 of 100   PageID 896

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to:
    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions or location of any improvement erected on the Land;
    (iii) subdivision of land; or
    (iv) environmental protection;
    or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims or other matters:
    (a) created, suffered, assumed or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A because of Unmarketable Title.
6. The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A.

# CONDITIONS

1. **DEFINITION OF TERMS.**
    The following terms when used in this policy mean:
    (a) "Amount of Insurance": the amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
    (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
    (c) "Entity": A corporation, partnership, trust, limited liability company or other similar legal entity.
    (d) "Insured": the Insured named in Schedule A.
        (i) The term "Insured" also includes:
            (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives or next of kin;
            (B) successors to an Insured by dissolution, merger, consolidation, distribution or reorganization;
            (C) successors to an Insured by its conversion to another kind of Entity;
            (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title;
                (1) If the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
                (2) If the grantee wholly owns the named Insured,
                (3) If the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
                (4) If the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.
        (ii) With regard to (A), (B), (C) and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
    (e) "Insured Claimant": an Insured claiming loss or damage.
    (f) "Knowledge" or "Known": actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
    (g) "Land": the land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
    (h) "Mortgage": mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
    (i) "Public Records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

    (j) "Title": the estate or interest described in Schedule A.
    (k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease or lend if there is a contractual condition requiring the delivery of marketable title.

2. **CONTINUATION OF INSURANCE.**
    The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3. **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**
    The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) below, or (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.
    When, after the Date of the Policy, the Insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in Title insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect or other matter is valid and not barred by law or statute. The Company shall notify the Insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the Insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the Insured of the reasons for its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the Title as insured; (ii) indemnify the Insured as provided in this policy; (iii) upon payment of appropriate premium and charges therefor, issue to the Insured Claimant or to a subsequent owner, mortgagee or holder of the estate or interest in the Land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the Land or, if a mortgage policy, the amount of the loan; (iv) indemnify another title insurance company in connection with its issuance of a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect; (v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or (vi) undertake a combination of (i) through (v) above.

4. **PROOF OF LOSS.**
    In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the

Owner's Policy of Title Insurance (T-1) (0

lien, encumbrance or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5. DEFENSE AND PROSECUTION OF ACTIONS.**

(a) Upon written request by the Insured, and subject to the options contained in Sections 3 and 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Sections 3 and 7, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction and it expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order. When the Company has reasonable grounds to dispute coverage under this policy, the Company may reserve its rights to pay the claim and the costs of defense and seek reimbursement from the Insured for all amounts paid for which there was no coverage.

**6. DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

(c) If the Insured demands that the Company accept a settlement offer that is not greater than the Amount of Insurance or if the Insured expressly agrees that a settlement offer should be accepted, the Company has a right to be reimbursed if it has timely asserted its reservation of rights and notified the Insured that it intends to seek reimbursement if it pays to settle or defend a claim that is not covered by the policy.

**7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay. Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**8. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of:

(i) the Amount of Insurance; or

(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 3 or 5 and is unsuccessful in establishing the Title, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9. LIMITATION OF LIABILITY.**

(a) If the Company establishes the Title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the Land, all as insured, or takes action in accordance with Section 3 or 7, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the Amount of Insurance by the amount of the payment.

**11. LIABILITY NONCUMULATIVE.**

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

**12. PAYMENT OF LOSS.**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT.**

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant

Case 4:23-cv-00337-O Document 3 Filed 04/17/24 Page 76 of 100 PageID 106

Title and all other rights and remedies in respect ....... the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

### 14. ARBITRATION.

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

### 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim, shall be restricted to this policy.

(c) Any amendment ....... or endorsement to this policy must be in writing and .... henticated by an authorized person or expressly incorporated by Schedul of this policy.

(d) Each endorsement to this policy issued at any time is made a part of t policy and is subject to all of its terms and provisions. Except as the endo ment expressly states, it does not (i) modify any of the terms and provisi of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Po or (iv) increase the Amount of Insurance. Each Commitment, endorsemen other form, or provision in the Schedules to this policy that refers to a te defined in Section 1 of the Conditions shall be deemed to refer to the te regardless of whether the term is capitalized in the Commitment, endo ment or other form, or Schedule. Each Commitment, endorsement or o form, or provision in the Schedules that refers to the Conditions and Stip tions shall be deemed to refer to the Conditions of this policy.

### 16. SEVERABILITY.

In the event any provision of this policy, in whole or in part, is held invali unenforceable under applicable law, the policy shall be deemed not to include provision or such part held to be invalid and all other provisions shall remain in force and effect.

### 17. CHOICE OF LAW; FORUM.

(a) Choice of Law: The Insured acknowledges the Company has underwri the risks covered by this policy and determined the premium charged ther in reliance upon the law affecting interests in real property and applicabl the interpretation, rights, remedies or enforcement of policies of title in ance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdic where the Land is located to determine the validity of claims against the T that are adverse to the Insured, and in interpreting and enforcing the term this policy. In neither case shall the court or arbitrator apply its confli laws principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insu against the Company must be filed only in a state or federal court within United States of America or its territories having appropriate jurisdiction

### 18. NOTICES, WHERE SENT.

Any notice of claim and any other notice or statement in writing required t given the Company under this Policy must be given to the Company at Nati Claims Administration, P.O. Box 45023, Jacksonville, Florida 32232-5023.

Owner's Policy of Title Insurance (T-1) (05/0



CHICAGO
TITLE INSURANCE
COMPANY

P.O. Box 45023
Jacksonville, Florida 32232-5023

**EXHIBIT D**
**DETENTION AGREEMENT**

## DEVELOPMENT AND OWNERS AGREEMENT
### (DETENTION FACILITIES)

THIS DEVELOPMENT AND OWNERS AGREEMENT (this "*Agreement*") is made and entered into this 12 day of *May*, 2010 ("*Effective Date*"), by and between **WAG Development, Ltd.,** a Texas limited partnership ("*WAG*"), and **Realty Capital Riverside, Ltd.,** a Texas limited partnership ("*Realty Capital*"), sometimes collectively referred to as the "*Parties*".

RECITALS:

A.    WAG is the owner of Lot 2R-2-1, Block A of the Riverside Commercial Addition, an addition in the City of Fort Worth, Tarrant County, Texas, according to the map or plat thereof recorded under Instrument No.D210097021of the Official Public Records of Tarrant County, Texas ("*Nursing Home Tract*").

B.    Realty Capital is the owner of Lot 2R-2-2 (herein so called) and Lot 2R-2-3, Block A of the Riverside Commercial Addition, an addition in the City of Fort Worth, Tarrant County, Texas, according to the map or plat thereof recorded under Instrument No. D210097021 of the Official Public Records of Tarrant County, Texas and Lot 2R-1 (herein so called), Block A of the Riverside Commercial Addition, an addition in the City of Fort Worth, Tarrant County, Texas, according to the map or plat thereof recorded under Instrument No. D208321025 of the Official Public Records of Tarrant County, Texas, which property is located adjacent to and near the Nursing Home Tract, (collectively, the "*Realty Capital Property*").  Lot 2R-2-3 and Lot 2R-1 shall sometimes be collectively referred to herein as the "*Benefitting Tracts*".

C.    WAG and Realty Capital enter into this Agreement to provide for the installation, construction and future maintenance of the Detention Improvements (hereinafter defined), as are necessary to serve the Nursing Home Tract and eventually the Benefitting Tracts and any subdivision thereof (collectively referred to herein as the "*Property*") in accordance with the Parties' intended uses and development of their respective portions of such Property.

D.    The Detention Improvements shall be constructed on Lot 2R-2-2 (the "*Detention Tract*").

E.    The Detention Pond shall be constructed and maintained pursuant to the City of Fort Worth's criteria, including but not limited to those described in the Storm Water Facility Maintenance Agreement between the City of Fort Worth (the "*City*") and Realty Capital Riverside, Ltd as shown in Exhibit B (the "*SWFMA*").

F.    On even date herewith, Realty Capital has conveyed a 71% undivided interest in the Detention Tract to WAG.

G.    The Parties enter into this Agreement to provide for such temporary construction easements and temporary rights-of-way as necessary for the construction of the Detention Improvements and to provide for permanent easements to provide access and utilities to and for the benefit of the Nursing Home Tract and the Benefitting Tracts.

AGREEMENTS:

NOW THEREFORE, for $10.00 and other good and valuable consideration, the receipt and sufficiency of which each party acknowledges, and in consideration of the mutual covenants and benefits in this Agreement, the Parties agree as follows.

1

1.    **Definitions**.  In addition to the terms defined elsewhere in this Agreement, the following definitions will apply to this Agreement:

(a)    "*Applicable Governmental Authority*" means the United States of America, the State of Texas, County of Tarrant, the City of Fort Worth, and/or any other governmental authority, agency, bureau, department, commission, tribunal, or other political subdivision with authority over or the ability to regulate the Property and the use and development of the Property or any activities on the Property (including any municipal utility district, water control and improvement district, or other similar entity).

(b)    "*Applicable Law*" shall mean all laws, statutes, codes, regulations, and ordinances applicable to or governing the development and use of the Property or any portion thereof.

(c)    "*Business Day*" means Monday through Friday of each week with the sole exception of any one or more of those days on which a Federal or state holiday falls and on which the County Clerk's office for Tarrant County, Texas is closed.

(d)    "*City*" means the City of Fort Worth, Texas.

(e)    "*Party*" means either WAG or Realty Capital, or any permitted assignee or successor of either of them under this Agreement.

(f)    "*Detention Improvements*" means the water quality and detention facilities, and all related improvements, to be constructed on the Detention Tract by WAG in accordance with Applicable Law in effect as of the date construction commences and the terms and provisions of this Agreement.

(g)    "*Additional Drainage Easement*" means that certain 10' wide easement granted by recorded plat across the southern five feet of the Nursing Home Tract and the northern five feet of Lot 2R-2-3 for the purposes of conveying storm water drainage from the Detention Tract to North Riverside Drive and the construction, installation, operation, inspection, maintenance, repair, replacement and upgrading of any associated drainage facilities and/or improvements on the Detention Tract.

(h)    "*Right of Way Improvements*" means that certain cul-de-sac and drive aisle located within the Detention Tract as generally depicted on Exhibit "A" attached hereto.

2.    **Improvements to be Constructed**.

(a)    In conjunction with the development of the Nursing Home Tract, WAG has agreed to construct (or cause to be constructed) the Detention Improvements on the Detention Tract, which Detention Improvements shall be of sufficient size and configuration so as to serve the Nursing Home Tract and eventually the Benefitting Tracts based on the Parties' intended uses and development of the Property.  In addition, the Detention Improvements shall comply with the SWFMA.  WAG will be primarily responsible for any permits and authorizations from the City and/or any Applicable Governmental Authority required for construction of the Detention Improvements.

(b)    Prior to commencing construction of the Detention Improvements, WAG shall submit the Plans (hereinafter defined) for the Detention Improvements to Realty Capital for review and approval (such approval not to be unreasonably withheld, conditioned or delayed).  If Realty Capital has any objections to the Plans, then it will advise WAG in writing within ten (10) business days after the delivery of the Plans,

2

otherwise the Plans shall be presumed to be approved by Realty Capital. The parties agree to work together diligently and in good faith to address any necessary changes or alterations to the Plans. The plans and specifications approved by the parties in accordance with this Section 2(b) shall be referred to herein as the *"Plans"*.

(c)     WAG shall contract for and manage the construction of the Detention Improvements on the Detention Tract in accordance with the Plans.

(d)     Within 12 months following the Effective Date, WAG shall have completed the Detention Improvements, subject to delays beyond WAG's control, including without limitation, Force Majeure Delays (hereinafter defined).

(e)     Upon completion of the Detention Improvements, WAG will notify Realty Capital in writing (*"Completion Notice"*) of such completion.

3.     **Detention Tract Ownership and Restrictions**.  The Detention Tract shall be used exclusively for purposes of location and operation of the Detention Improvements and the Right of Way Improvements and for no other purposes without the prior written consent of the owners of the Property and the City. This restriction shall run with the land. The Parties hereby acknowledge and agree that ownership of the Detention Tract shall be owned jointly as follows: the owner of the Nursing Home Tract shall own an undivided 71% interest; the owner of Lot 2R-2-3 shall own an undivided 14% interest; and the owner of Lot 2R-1 shall own an undivided 15% interest. WAG and Realty Capital agree that in any conveyance of the Nursing Home Tract, Lot 2R-2-3 or Lot 2R-1, such Parties' undivided interest in the Detention Tract and all obligations in the SWFMA shall be included with such conveyance.

4.     **Modification of Detention Improvements.**  After WAG has completed construction of the Detention Improvements, any owner of any portion of the Realty Capital Property (for purposes of this Paragraph, the *"Constructing Party"*) may, at its sole cost and expense, modify the Detention Improvements as necessary to accommodate development of such applicable portion of the Realty Capital Property; provided, however, any such modifications must (i) be performed by a contractor approved in writing in advance by the owner of the Nursing Home Tract, which approval shall not be unreasonably withheld and shall be deemed given if no response is made within ten (10) business days after receipt of written request for approval, (ii) include restoring turf, landscaping, fences or any other improvements on the Detention Tract to their pre-modification condition or better, or if different, at least as good, (iii) not materially prohibit, impede or interfere with the use of the Detention Improvements by any other owner of any portion of the Property, (iv) meet the requirements of the SWFMA and (v) be constructed in a diligent, good and workmanlike manner. The Constructing Party shall not permit any mechanics', materialmen's or other professional services liens to be placed against the Detention Tract or any other portion of the Property not owned by the Constructing Party for any work done or materials furnished in connection with the performance of any work performed by the Constructing Party pursuant to this Section 4. If a lien is filed against the Detention Tract or any other portion of the Property not owned by the Constructing Party, the Constructing Party shall cause any such lien to be released of record or transferred to bond in accordance with applicable law within thirty (30) days after such lien is filed of record. The Constructing Party shall hold the owners of the Detention Tract, and if applicable, the owners of any other portion of the Property harmless and fully indemnified against any and all claims, demands, losses, liabilities, damages and costs or expenses (including reasonable attorneys' fees, court costs and other sums) incident to the defense of any claim arising from any liens, damages to property, personal injury and worker's compensation claims, that may be incurred arising out of any work performed pursuant to this Section 4 by the Constructing Party and its agents, employees, contractors, subcontractors. The Constructing Party shall maintain liability insurance in

3

4

customary amounts covering claims for personal injury, bodily injury or death, and property
damage or destruction arising out of such party's work performed pursuant to this Section 4.

5.   **Detention Tract Maintenance**.   Once the Detention Improvements are
constructed and completed, the Detention Improvements will be maintained by the owner of the
Nursing Home Tract at its sole cost and expense in a good and functioning condition so as to
minimize soil erosion and keep grass and vegetation mowed and maintained in accordance with
the SWFMA.  Notwithstanding the above, at such time as improvements are completed on either
Lot 2R-2-3 or Lot 2R-1 of the Realty Capital Property, the owner of the Nursing Home Tract and
the owners of either Lot 2R-2-3 and/or Lot 2R-1 of the Realty Capital Property (as applicable,
depending on which Lot has been improved) shall each be responsible for their pro rata share (in
the percentages set forth in Section 7(a) below) of maintenance of the Detention Improvements.
At such time, WAG or its successor shall prepare and deliver to the owners of the Realty Capital
Property quarterly invoices for each owner's pro rata share of such expenses.  Payment of each
owner's pro rata share shall be delivered to WAG or its successor within 30 days following
receipt of an invoice therefor.

6.   **Detention Tract Taxes**.  The owner of the Nursing Home Tract and the owners
of Lots 2R-2-3 and 2R-1 of the Realty Capital Property shall each be responsible for their pro
rata share (in the percentages set forth in Section 7(b) below) of property taxes assessed on the
Detention Tract.  WAG or its successor shall prepare and deliver to the owners of Lots 2R-2-3
and 2R-1 of the Realty Capital Property invoices for each owner's pro rata share of such property
tax.  Payment of each owner's pro rata share shall be delivered to WAG or its successor within
30 days following receipt of an invoice therefore, and WAG shall pay same prior to delinquency.

7.   **Pro Rata Shares**.

(a)   Once improvements have been completed on either Lot 2R-2-3 or
Lot 2R-1 of the Realty Capital Property, each owner's pro rata share for the costs and
expenses referenced in Section 5 of this Agreement shall be as follows:

Owner of the Nursing Home Tract:  71%, or 83% if only Lot 2R-2-3 has been
improved, or 83% if only Lot 2R-1 has been improved

Owner of Lot 2R-2-3 of the Realty Capital Property: 14%, or 17% if Lot 2R-1 has
not been improved

Owner of Lot 2R-1 of the Realty Capital Property: 15%, or 17% if Lot 2R-2-3 has
not been improved.

(b)   Each owner's pro rata share for the costs and expenses referenced
in Section 6 of this Agreement shall be as follows:

Owner of the Nursing Home Tract: 71%

Owner of Lot 2R-2-3 of the Realty Capital Property: 14%

Owner of Lot 2R-1 of the Realty Capital Property: 15%

(c)   If either the Nursing Home Tract or Lot 2R-2-3 or Lot 2R-1 of the
Realty Capital Property is further subdivided, the Party conveying such portion of the
Property shall notify the other owners of the Property in writing of the sale and set forth in
such notice the pro rata share that shall be allocated to the portion of the Property that is
being conveyed for purposes of this Agreement.  Furthermore, the conveyance document

4

into the new owner shall specifically state the pro rata share that is to be allocated to that portion of the Property for purposes of this Agreement.

       8.       **Cooperation.**  Realty Capital agrees to reasonably cooperate with WAG and its contractor in connection with obtaining all required permits and authorizations for construction of the Detention Improvements, including without limitation, any building permits and any approvals required by any Applicable Governmental Authority, and shall assign or otherwise make available to WAG the use of any and all such permits and authorizations for construction.

       9.       **Performance of Work/Easements.**

           (a)       The Detention Improvements will be constructed and installed in accordance with, Applicable Laws and any applicable detention plans.

           (b)       In the event that in connection with maintenance of the Additional Drainage Easement, it is necessary for WAG or Realty Capital (or their respective employees, agents, contractors or subcontractors) to enter onto the property of the other, the Parties each hereby grant to the other such temporary construction and maintenance easements ("*Temporary Easements*") on such portions of their respective property for such periods of time, and from time to time, as may be reasonably necessary for the purpose of performing the maintenance and/or repairs of the Additional Drainage Easement. Except as is reasonable and necessary in the performance of such maintenance and/or repair work, neither Party will in any way use or permit the Temporary Easements to be used in a manner which would unreasonably interfere with the other's use and enjoyment of its property.

           (c)       In the event that in connection with construction of the Detention Improvements it is necessary for WAG (or its respective employees, agents, contractors or subcontractors) to enter onto Lot 2R-2-3 or Lot 2R-1 of the Realty Capital Property, Realty Capital hereby grants to WAG a temporary access and construction easement on such portions of Lot 2R-2-3 and Lot 2R-1 of the Realty Capital Property for such periods of time, and from time to time, as may be reasonably necessary for the purpose of constructing the Detention Improvements. Except as is reasonable and necessary in the performance of such construction work, WAG will not use or permit the forgoing easement to be used in a manner which would unreasonably interfere with Realty Capital's use and enjoyment of its property.

       10.       **General Provisions relating to Breach or Default; Late Fees.**

           (a)       **Default.**  A default ("*Default*") shall be deemed to have occurred hereunder if a Party shall breach or fail to perform, observe or meet any covenant or condition made in this Agreement, or if a Party shall breach or fail to perform, observe or meet any of their respective obligations under this Agreement (other than a default in the payment of money for which no notice shall be required), and such breach or failure shall not be corrected within thirty (30) days after receipt by the defaulting party (the "*Defaulting Party*") of notice from a non-defaulting party (the "*Non-defaulting Party*"), or, in the event such breach or failure cannot reasonably be cured within thirty (30) days, if the Defaulting Party shall not have commenced, within said 30-day period to cure such breach or Default and be diligently pursuing such cure. Notwithstanding the above, in no event shall a Default be allowed to extend beyond a total period of 60 days.

           (b)       **Remedies.**  If a Default occurs which is not cured within the applicable cure period, then the Non-defaulting Party may (i) cure such default, and be reimbursed by the Defaulting Party for all reasonable costs and expenses incurred in

curing such default, (ii) seek injunctive relief against the Defaulting Party, or (iii) file a Lien Claim (in the case of a monetary default). Each Party's obligation to pay its pro rata share of the Costs of Construction, maintenance, taxes and any other costs under this Agreement shall be secured by a lien on their respective property for the unpaid amount due, together with the Non-defaulting Party's costs and reasonable attorney's fees in enforcing and foreclosing upon such lien; provided, however, such lien shall attach only upon recordation of a notice thereof in the real property records of Tarrant County, Texas, which notice shall include the following information: the name of the lien claimant; a description of the Defaulting Party's property; a description of the work performed or damage suffered which has given rise to the claim of a lien and a statement itemizing the amount thereof; and a statement that the lien is claimed pursuant to the provisions of this Agreement ("*Lien Claim*"). Notwithstanding the foregoing or anything to the contrary contained herein, (i) the Non-defaulting Party shall give the Defaulting Party not less than ten (10) days written notice prior to filing any Lien Claim, (ii) all liens created hereunder shall be and remain subordinate to all existing and future liens of third party lenders which made acquisition or construction loans secured by the Property.

(c)     Limitation on Damages. Realty Capital hereby waives any claim, for any and all consequential, punitive, exemplary, incidental, or delay damages arising from or connected with WAG's failure to timely complete any of the Detention Improvements. In the event WAG defaults in the timely performance or completion of the Detention Improvements, Realty Capital's sole remedy shall be to be to either (i) assume control of and responsibility for performance and completion of the Detention Improvements (subject to WAG's obligation to reimburse Realty Capital for same), or (ii) seek specific enforcement of this Agreement.

(d)     No Waiver. No failure of any Party to exercise any power given to such Party hereunder or to insist upon strict compliance by any other Party with its obligations hereunder and no custom or practice of the Parties in variance with the terms hereof shall constitute a waiver of any Party's right to demand compliance with the terms thereof.

(e)     No Termination. The Parties expressly agree that any Party's breach of or default under this Agreement shall not entitle either Party to cancel, rescind, or otherwise terminate this Agreement. Such limitation shall not affect in any manner any other rights or remedies which the Non-defaulting Party may have hereunder by reason of any such breach or default.

(f)     Attorneys Fees. In the event of any legal proceedings arising out of this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party its reasonable attorney's fees and expenses and court costs.

(g)     Late Fees.     If WAG does not receive any payment referenced in Section 6 or 7 herein within ten (10) days after such payment is due, WAG, at its option, may charge such non-paying Party a late charge equal to five percent (5%) of the amount due and such late charge shall be due and payable by such non-paying Party to WAG immediately upon written notice to such non-paying Party. WAG's ability to charge a late fee shall be in addition to any and all other remedies available to WAG pursuant to this Agreement.

11.     **Force Majeure**. If for any reason a Party is unable to comply with the terms of this Agreement (through no fault of the Party itself) because of inability to obtain required approvals from any Governmental Authority (including, without limitation, approval of site plans and/or construction drawings or issuance of building permits) or because of acts of war, riot, civil commotion, strike, fire, flood, or acts of God, unforeseeable shortages of materials,

6

terrorism, inclement weather, delays in approvals by another Party, or delays caused by any other governmental or quasi-governmental agency, and new governmental restrictions (collectively, "*Force Majeure Delays*"), deadlines for commencement and completion of construction shall be extended by one day for each day that a Force Majeure Delay exists.

12.   **General Covenant of Mutual Cooperation and Good Faith**.  WAG and Realty Capital agree to mutually cooperate with each other and the City and to do all things as necessary to assist each other in meeting the requirements of the City and the SWFMA.  The Parties agree that they will at all times and in all matters respecting the development of the Property deal with each other in good faith, will cooperate with each other in carrying out the development of the Property, will not unreasonably withhold or delay consent when needed by any other Party hereto and provided for or required herein, and will execute and deliver any document reasonably needed by any other Party hereto in order to fulfill the purposes of this Agreement.

13.   **Covenants Run With the Land**.  The rights, obligations and benefits established pursuant to this Agreement shall run with the land and be appurtenant to the Nursing Home Tract and Realty Capital Property and shall constitute liens upon such tracts foreclosable by judicial action and shall be binding on WAG and Realty Capital and their respective successors and assigns and all subsequent owners of any portion of the Property.

14.   **No Partnership or Agency**.  WAG and Realty Capital agree that they are not partners or joint venturers and neither this Agreement nor any actions taken by either Party pursuant to this Agreement shall constitute or be construed as creating any type of partnership or joint venture.  In no event will any of the Parties hereto be liable or responsible for any contractual, tortious, or other liability, obligation, or debt of any other Party, except as may be provided for in the SWFMA.  This Agreement does not establish any principal-agent relationship by or between any Party.

15.   **Notice**.  All notices, demand, statement and requests required or permitted to be given under this Agreement shall be given in writing and shall be deemed given when delivered by messenger delivery or on the date of deposit in the United States mail, postage prepaid, registered or certified mail, return receipt requested, properly addressed to the applicable Parties as set forth below or to such other address as either Party may designate by written notice to the other Party.

|           |                                    |
|-----------|------------------------------------|
| If to WAG:          | WAG Development, Ltd.<br>610 Towson Avenue<br>P.O. Box 2207<br>Fort Smith, Arkansas 72901/72902<br>Attn: Rick Griffin |
| If to Realty Capital: | Realty Capital Riverside Ltd.<br>8333 Douglas Avenue, Suite 110<br>Dallas, Texas 75225<br>Attn: James W. Archie II |

16.   **Miscellaneous Provisions**

(a)   **Binding Upon Successors; Notification of Sale**.  This Agreement shall be binding upon and shall inure to the benefit of WAG and Realty Capital and their respective legal representatives, executors, administrators, successors, heirs and assigns. The assumption of a liability, especially to pay a sum of money, does not relieve any Party earlier bound thereby, who shall remain jointly and severally obligated therefor with any assumptor, unless released by the Party (or Parties) to whom such an obligation is owed. Upon the conveyance of Lot 2R-2-3 and/or Lot 2R-1 of the Realty Capital Property,

7

Realty Capital (or the then current owner of Lot 2R-2-3 and/or Lot 2R-1 of the Realty Capital Property, as applicable) shall provide WAG written notice of such conveyance which notice shall include the address and other pertinent contact information of the new owner(s) so that WAG will have the proper contact information in order to send invoice the new owner(s) for the pro rata share of the costs provided for in this Agreement.

(b)    <u>Amendment</u>. This Agreement may be canceled, changed, modified or amended, in whole or in part, only if consistent with the SWFMA and only by the written and recorded agreement by the owner of the Nursing Home Tract and the then current owner(s) of Lots 2R-2-3 and 2R-1 of the Realty Capital Property upon prior notice to the City.

(c)    <u>Entire Agreement</u>. This Agreement embodies the entire agreement between the Parties regarding the subject matter hereof. There are no oral understandings or agreements between the Parties.

(d)    <u>No Third Party Beneficiary</u>. This Agreement is not intended to and does not confer on any person other than WAG and Realty Capital, and their successors and permitted assigns, any rights, obligations, remedies, or liabilities. This Agreement is solely for the benefit of WAG and Realty Capital and their successors and permitted assigns.

(e)    <u>Severability</u>. If any provision of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

(f)    <u>Number and Gender; Captions</u>. Whenever used herein, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

(g)    <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States of America applicable to transactions in Texas.

(h)    <u>Multiple Counterparts</u>. This Agreement may be executed in any number of identical counterparts, each of which shall constitute an original and shall together constitute one and the same instrument.

17.    <u>City Agreement</u>. The Parties acknowledge that Realty Capital has entered into the SWFMA with the City concerning the Detention Improvements. In addition to the terms and conditions of this Agreement, the Detention Improvements shall be constructed and maintained in accordance with the SWFMA. The owner of the Nursing Home Tract will be responsible for submitting the annual inspection report referenced in Section 2 of the SWFMA.

18.    <u>Exhibits</u>. The following exhibits are attached to and incorporated in this Agreement by reference:

<u>Exhibit "A"</u> -    Right of Way Improvements

<u>Exhibit "B"</u>-    SWFMA

8

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

REALTY CAPITAL RIVERSIDE LTD., a Texas limited partnership

By: Realty Capital Corporation
Its: General Partner

By: _____
Name: _James W. Archie II_
Title: _President_

Date: _5/12_____, 2010

WAG DEVELOPMENT, LTD., a Texas limited partnership

By: HC NURSING HOME, LLC
Its: General Partner

By: _____
      Rick Griffin, Manager

Date: _May 10_____, 2010

10

THE STATE OF TEXAS                    §
                                      §
COUNTY OF Tarrant                     §

This instrument was acknowledged before me on the 12 day of
May, 2010 by James W. Archie, II as
President of Realty Capital Corporation, General Partner of Realty Capital
Riverside, Ltd., on behalf of said corporation and limited partnership.

_____
Notary Public – State of Texas

GAYLE G. WILLIAMS
Notary Public
STATE OF TEXAS
My Comm. Exp. 04/13/2011

THE STATE OF ARKANSAS                 §
                                      §
COUNTY OF Sebastian                   §

This instrument was acknowledged before me on the 10th day of
May, 2010 by Rick Griffin as Manager of HC Nursing Home,
LLC, General Partner of WAG Development, Ltd., on behalf of said limited liability company
and limited partnership.

_____
Notary Public – State of Arkansas

JANA JETTON
NOTARY PUBLIC
SEBASTIAN COUNTY, ARKANSAS

After recording, return to:

J. Andrew Rogers
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

11



Right of Way Improvements

Exhibit A

Exhibit B

## STORM WATER FACILITY
## MAINTENANCE AGREEMENT

THIS AGREEMENT, made and entered into this _____ day of _____, 2010, by and between REALTY CAPITAL RIVERSIDE, LTD., a Texas limited partnership, hereinafter referred to as "Landowner", and the City of Fort Worth, hereinafter referred to as "City".

### WITNESSETH

WHEREAS, the Landowner is the owner of Lot 2R-2-1, Lot 2R-2-2 and Lot 2R-2-3, Block A of the Riverside Commercial Addition, an addition in the City of Fort Worth, Tarrant County, Texas, according to the map or plat thereof recorded under Instrument No. D216017021 of the Official Public Records of Tarrant County, Texas, hereinafter called the "Property".

WHEREAS, the Landowner (or its successor and assigns) is proceeding to build on and develop the Property according to the Site Plan/Subdivision Plan known as WAG Development, Ltd. On Site Development Plans; Project No. D2W097021 hereinafter called the "Plan", which is expressly made a part hereof, as approved or to be approved by the City and the Landowner provides for management of storm water within the confines of the Property; and

WHEREAS, the City and the Landowner, and their successors and assigns, agree that the health, safety and welfare of the residents of the City of Fort Worth, Texas require that on-site Storm Water Management Facilities be constructed and maintained on a portion of the Property; and

WHEREAS, the City requires that on-site Storm Water Management Facilities ("Facility") as shown on the Plan be constructed and adequately maintained by the Landowner, its successors and assigns, on Lot 2R-2-2, Block A of the Riverside Commercial Additional, an addition in the City of Fort Worth, Tarrant County, Texas,

STORM WATER FACILITY MAINTENANCE AGREEMENT
Rev. 01/08/2007

1

13

according to the map or plat thereof recorded under Instrument No. _D2l0097021_ of the Official Public Records of Tarrant County, Texas ("Facility Property"). Said Facility Property is also described by metes and bounds on Exhibit "A-1" and depicted on Exhibit "A-2" attached hereto; and

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants contained herein, and the following terms and conditions, the parties hereto agree as follows:

1.  The Landowner, its successors and assigns, shall adequately construct and maintain the Facility at no expense to the City of Fort Worth in accordance with the design specifications for the Facility, attached as Exhibit "A", and the current standards then in force and effect in the City of Fort Worth and with the Operations and Maintenance Plan attached to this Agreement as Exhibit "B". The Storm Water Facility includes all pipes, channels or other conveyances built to convey storm water to the facility, as well as all structures, improvements, and vegetation provided to control the quantity and quality of the storm water. Adequate maintenance is herein defined as good working condition so that these facilities are performing their design functions. The Storm Water Structural Control Maintenance Checklists, attached to this Agreement as Exhibit "C", are to be used to establish what good working condition is acceptable to the City.

2.  The Landowner, its successors and assigns, shall inspect the Facility and submit an inspection report to the City annually. The purpose of the inspection is to assure safe and proper functioning of the Facility. The inspection shall cover the entire Facility, berms, outlet structure, pond areas, access roads, etc. Components of the Facility, which need maintenance or replacement to perform their design function, shall be noted in the inspection report along with the corrective actions to be taken.

3.  The Landowner, its successors and assigns, hereby grant permission to the City, its authorized agents and employees, to enter upon the Property and to

inspect the Facility Property whenever the City deems necessary. The purpose of inspection is to follow-up on reported deficiencies and/or to respond to citizen complaints. The City shall provide the Landowner, its successors and assigns, copies of the inspection findings and a directive to commence with the repairs if necessary.

4.  In the event the Landowner, its successors and assigns, fails to maintain the Facility in good working condition acceptable to the City, the City, its authorized agents and employees, may enter upon the Facility Property and take whatever steps necessary to correct deficiencies identified in the inspection report and to charge the costs of such repairs to the Landowner, its successors and assigns. It is expressly understood and agreed that the City is under no obligation to routinely maintain or repair said Facility, and in no event shall this Agreement be construed to impose any such obligation on the City, such obligation is Landowner's.

5.  The Landowner, its successors and assigns, will perform the work necessary to keep the Facility in good working order as appropriate. In the event the City pursuant to this Agreement, performs work of any nature, or expends any funds in performance of said work for labor, use of equipment, supplies, materials, and the like, the Landowner., its successors and assigns, shall reimburse the City upon demand, within thirty (30) days of receipt thereof for all actual costs incurred by the City hereunder. In the event that Landowner or its successors or assigns fail to pay the City for the costs incurred under this section, the City shall impress a lien for the costs of such work upon other lots owned by the Landowner. Such lien shall be perfected by filing in the office of the County Clerk of Tarrant County, Texas an affidavit identifying the property to be charged with such lien, stating the amount thereof, and making reference to this Agreement.

6.  This Agreement imposes no liability of any kind whatsoever on the City. THE LANDOWNER AGREES TO HOLD THE CITY HARMLESS FROM ANY LIABILITY IN THE EVENT THE FACILITY FAILS TO OPERATE PROPERLY. LANDOWNER COVENANTS AND AGREES

AND DOES HEREBY INDEMNIFY, HOLD HARMLESS AND DEFEND THE CITY OF FORT WORTH, ITS AGENTS, SERVANTS AND EMPLOYEES FROM AND AGAINST ALL COSTS, EXPENSES, LOSSES, DAMAGES, CLAIMS OR CAUSES OF ACTION WHATSOEVER ARISING, OR WHICH MIGHT ARISE, FROM THE FAILURE OF OWNER OR ANY FUTURE OWNERS OF THE ABOVE FACILITITY PROPERTY TO MAINTAIN THE BED AND BANKS OF THE DETENTION POND IN ACCORDANCE HEREWITH, OR AS A RESULT OF ANY DAMAGES CAUSED TO PERSON OR PROPERTY DUE TO (1) FLOODING OF THE POND AND ITS BANKS, (2) SLOPE FAILURE OF THE BANK OF THE POND, AND (3) AND FAILURE OF THE POND AND ITS BANK TO OPERATE IN A MANNER CONSISTENT WITH CITY OF FORT WORTH CRITERIA TO PERFORM ANY OF ITS DUTIES OR OBLIGATIONS HEREUNDER.

7.  Landowner covenants and agrees that no habitable building shall be erected on the Facility Property but this paragraph shall not preclude construction of other improvements upon the Facility Property, which do not impede drainage. Landowner covenants and agrees that no habitable building shall be erected on the Facility Property which shall have a finished floor at an elevation less than two feet above the maximum depth of water in the detention pond which would occur during a 100 year frequency flood.

8.  This Agreement shall be recorded among the land records of Tarrant County, Texas, and shall constitute a covenant running with the land, and shall be binding on the Landowner, its administrators, executors, assigns, heirs and any other successors in interests, including any property owners association.

[Signature Page to Follow]

Executed this 21ᵗʰ day of January 2010.

Landowner:

City:
City of Fort Worth

REALTY CAPITAL RIVERSIDE LTD.,
A Texas limited partnership

By: Realty Capital Corporation
Its: General Partner

By: *James W. Archie II*
Name: James W. Archie II

Title: *President*

Fernando Costa
Assistant City Manager

Approved as to Form and Legality

_____
Assistant City Attorney

ATTEST

_____
City Secretary

STORM WATER FACILITY MAINTENANCE AGREEMENT
Rev. 01/08/2007

5

STATE OF TEXAS                    §

COUNTY OF TARRANT                 §


This instrument was acknowledged before me on _____ by Fernando Costa, Assistant City Manager of the City of Fort Worth, on behalf of the City of Fort Worth.


_____
Notary Public, State of Texas


STATE OF TEXAS                    §

COUNTY OF _____               §


This instrument was acknowledged before me on the _____ day of _____, 2010 by _____, as _____ of Realty Capital Corporation, General Partner of Realty Capital Riverside, Ltd., on behalf of said corporation and limited partnership.


_____
Notary Public - State of Texas


STORM WATER FACILITY MAINTENANCE AGREEMENT
Rev. 01/09/2007                                                    6



# JPH Land Surveying, Inc.

807 Bluebonnet Drive, Suite C, Keller, Texas 76248
Tel (817)431-4971 Fax (866)290-4631

Exhibit "A-1"
Metes & Bounds

*FIELD NOTES* to that certain tract being a portion of the tract described in the deed to Realty Capital Riverside, Ltd. recorded under Instrument Number D203104699 of the Official Public Records of Tarrant County, Texas said tract being a portion of Lot 2R-2, Block A, Riverside Commercial Addition, an addition in the City of Fort Worth, Tarrant County, Texas according to the plat recorded under Instrument Number D208321025 of the Official Public Records of Tarrant County, Texas; the subject tract is more particularly described by metes and bounds as follows:

*Beginning*  at a 1/2 inch capped rebar stamped "LANDES & ASSOC." found at the northwest corner of Lot 2R-1, Block A, Riverside Commercial Addition according to the plat recorded under Instrument Number D208321025 of the Official Public Records of Tarrant County, Texas;

THENCE  South 88 Degrees 24 Minutes 39 Seconds West (*bearing basis*), with the south line of Lot 2R-2, Block A, Riverside Commercial Addition according to the said plat recorded under Instrument No. D208321025 of the said Official Public Records, a distance of 232.31 feet to a ½ inch capped rebar stamped "LANDES & ASSOC." found at an angle point in the said south line of Lot 2R-2, said ½ inch capped rebar being the beginning of a curved access easement according to the plat recorded under Instrument No. D207074407 of the said Official Public Records, said curve being concave to the southwest having a radius of 50.00 feet and a chord bearing of North 49 Degrees 35 Minutes 27 Seconds and a chord distance of 75.53 feet;

THENCE  in a northeasterly direction and then a southwesterly direction, with the said access easement and through the interior of Lot 2R-2, and along the arc of the said curve through a central angle of 261 Degrees 53 Minutes 29 Seconds and an arc length of 228.54 feet to a ½ inch capped rebar stamped "JPH LAND SURVEYING" set at the intersection of the said access easement and the west line of Lot 2R-2;

THENCE  North 00 Degrees 32 Minutes 12 Seconds West, with the west line of Lot 2R-2, a distance of 132.49 feet to a ½ inch capped rebar stamped "JPH LAND SURVEYING" recovered at a reentrant corner of Lot 2R-2;

THENCE  North 88 Degrees 31 Minutes 37 Seconds East, being an easterly projection of the most westerly south line of Lot 2R-2, a distance of 286.01 feet to a set ½ inch capped rebar stamped "JHP LAND SURVEING";

THENCE  South 01 Degree 35 Minutes 21 Seconds East, continuing through the interior of Lot 2R-2, a distance of 182.42 feet returning to the *Place of Beginning* and enclosing 44,172 square feet.

Jewel Chadd
Registered Professional
Land Surveyor No. 5754
January 10, 2010
2009.009.003



Exhibit "B"

## CITY OF FORT WORTH STORM WATER FACILITY
## OPERATION AND MAINTENANCE PLAN

The only responsibility the City of Fort Worth has in the operation and maintenance of this Facility is inspection.

**General Maintenance Procedures**

The structural and functional integrity of the Facility shall be maintained at all times by removing and preventing drainage interference, obstructions, blockages, or other adverse effects into, through, or out of the system.

Periodic silt removal shall occur when standing water conditions occur or the pond's storage volume is reduced by more than 10%. Silt shall be removed and the pond/basin returned to original lines and grades shown on the approved engineering plans. In addition, corrective measures are required any time a basin does not drain completely within 72 hours of cessation of inflow. NO STANDING WATER IS ALLOWED in basins designed for dry detention purposes.

Accumulated litter, sediment, and debris shall be removed every 6 months or as necessary to maintain proper operation of the basin. Disposal shall be in accordance with federal, state and local regulations.

Detention facilities shall be mowed monthly between the months of April and October or anytime vegetation exceeds 12-inches in height.

To prevent debris from entering and clogging the downstream storm sewer system a wire mesh screen or similar screening device shall be installed over the outlet until final acceptance.

### 4. PREVENTIVE MAINTENANCE/INSPECTION

- Visual inspections of all components will be conducted every 6 months.
- A log shall be kept of maintenance actions, and inspections. The log should document the condition of the detention system's primary components, mowing, and silt, litter and debris removal dates. Document aeration of the basin bottoms and replanting to prevent the sealing of the basin bottom.
- **Written maintenance and repair records shall be maintained by the party or parties signing the attached Agreement and shall be provided to the City upon request.**

STORM WATER FACILITY MAINTENANCE AGREEMENT
Rev. 01/08/2007

8

Exhibit "C"

**Storm Water Structural Maintenance CHECKLIST**

| FREQUENT INSPECTION | DATE | REPAIRS REQUIRED | REPAIRS MADE | NOTES |
|---|---|---|---|---|
| Mowing | | | | |
| Remove Trash and debris | | | | |
| Inspect irrigation system operation | | | | |
| Remove grass clippings | | | | |
| Violations Noted | | | | |
| | | | | |
| **MINOR INSPECTION** | | | | |
| Condition of Pond | | | | |
| Amount of silt in pond | | | | |
| Amount of silt in flume | | | | |
| Amount of ponded water | | | | |
| Amount of wetland vegetation | | | | |
| Location of Erosion | | | | |
| Percent of vegetation | | | | |
| Condition of trash guard | | | | |
| Location of Erosion | | | | |
| | | | | |
| **MAJOR INSPECTIONS** | | | | |
| Condition of Storm Water Quality Structure | | | | |
| Type of Storm Water Quality Structure | | | | |
| Structure type and Condition | | | | |
| Condition of Rip- | | | | |

| Rap | | | | |
|---|---|---|---|---|
| Condition of filtration system | | | | |
| Berm or Embankment Settlement | | | | |
| Location of erosion | | | | |
| Evidence of Animals | | | | |
| Evidence of Aquatic life | | | | |
| Condition of Aeration Foundation | | | | |